**NOTICE:  SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the De Facto Parentage of: | No. 57171-4-II |
| A.H., | |
| Minor child. | PUBLISHED OPINION |

GLASGOW, C.J. — Melissa Headrick, AH's mother, was in a relationship with Christian Gruber that began when she was pregnant at 18 and he was 38. Gruber is not AH's birth parent. After the relationship ended, Gruber petitioned for de facto parentage of AH, meaning a determination that he was AH's legal parent with the accompanying rights and responsibilities.

At a hearing, the trial court did not appoint a guardian ad litem for AH. Before the parties presented their witness testimony or arguments, the trial court stated that it thought Gruber had met his burden of proof to establish himself as a de facto parent. The trial court allowed Headrick to testify and Gruber to cross-examine her, but it did not require Gruber to testify or be cross-examined. Ultimately, the trial court concluded that Gruber was AH's de facto parent.

Headrick appeals the order awarding Gruber the rights of a legal parent and the trial court's findings of fact and conclusions of law about de facto parentage. Along with raising constitutional challenges to RCW 26.26A.440, the de facto parentage statute, Headrick argues that the trial court erred in its interpretation and implementation of the statute. Specifically, she contends that the trial court applied an unconstitutional process by depriving Headrick of the opportunity to cross-examine Gruber and that it failed to resolve material factual questions concerning Gruber's

No. 57171-4-II

standing to bring a petition concerning his de facto parentage. Headrick also assigns error to the trial court's failure to appoint a guardian ad litem for AH.

We hold that RCW 26.26A.440 requires any de facto parentage proceeding involving a material factual dispute to include testimony from the petitioner so that the trial court can evaluate their credibility based on their testimony and to ensure an opportunity for the legal parent to cross-examine the petitioner. We therefore reverse the trial court's adjudication of Gruber as AH's de facto parent and remand for further proceedings consistent with this opinion. The trial court must vacate the order granting Gruber de facto parent status. We recognize that there may have been subsequent trial court orders establishing residential time for AH. Any current residential provision for the child remains as a temporary order until the parties return to the trial court and have a new order entered consistent with this opinion. On remand, the trial court must also revisit the appointment of a guardian ad litem for AH and consider on the record whether appointment is necessary to adequately represent AH's interests.

FACTS

I. BACKGROUND AND DE FACTO PARENTAGE PETITION

Gruber and Headrick began dating while she was pregnant with AH. At the time, Headrick was 18 years old and Gruber was 38 years old. Gruber moved in with Hedrick when AH was about three years old. Gruber and Headrick had a polyamorous relationship, so later on, Headrick's new partner moved into the home Headrick shared with Gruber. Gruber and Headrick's relationship ended when AH was about nine years old.

After Gruber and Headrick broke up, Headrick wanted to move out of state so she could live close to family. On her own, Headrick could not afford to buy a home in Clark County, where

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 57171-4-II

she and Gruber had resided together. But as soon as Gruber and Headrick broke up, Gruber filed a petition for de facto parentage of AH. Headrick stayed in Clark County to respond to the petition.

To become AH's de facto parent, Gruber had to prove a series of statutory elements by a preponderance of the evidence: that he "resided with the child as a regular member of the child's household for a significant period"; that he "engaged in consistent caretaking of the child"; that he undertook the "full and permanent responsibilities of a parent of the child without expectation of financial compensation"; that he "held out the child" as his own; that he "established a bonded and dependent relationship with the child which [was] parental in nature"; that Headrick "fostered or supported the bonded and dependent relationship"; and that continuing his relationship with AH was in AH's best interest. RCW 26.26A.440(4)(a)-(g).

In his petition, Gruber alleged that while AH was living with him, he provided "emotional and material support," including play, at-home educational support, feeding, "clothing, being a source of advice and helping problem-solve, listening, noticing changes and adverse emotional circumstances, framing difficult life situations, protecting, and loving" AH. Ex. 1, at 15. He further alleged that when Headrick had health challenges that made her briefly absent from the home, he "was present for" and "comforted" AH while preserving a healthy relationship between Headrick and AH. *Id.* at 16.

Along with the petition, Gruber also filed documents showing his relationship with AH. These documents included an authorization to disclose AH's immunization records to him; evidence that he was listed as AH's guardian with AH's school; a digital calendar invitation to attend a doctor appointment for AH; and emails with AH's school principal, school counselor, and teacher, including an email about attending a parent-teacher conference. He also submitted a

3

No. 57171-4-II

document in which Headrick identified Gruber as the person who should become AH's guardian and care for AH if Headrick were to pass away before AH turned 18. Finally, Gruber submitted transcripts of two videos in which he and Headrick proclaimed that he would be AH's father and in which AH referred to him as "daddy." Exs. 8-9.

## II. DE FACTO PARENTAGE PROCEEDING

Headrick filed a response to Gruber's petition denying that Gruber engaged in consistent caretaking of AH, that Gruber established a bonded and dependent parental relationship with AH, and that continuing the relationship between Gruber and AH was in AH's best interests. The trial court then held a hearing. The trial court asked if either party wanted the court to appoint a guardian ad litem for AH. Headrick's attorney responded, "Absolutely, Your Honor." Verbatim Rep. of Proc. (VRP) (May 20, 2022) at 13. Gruber's attorney said, "My problem is that I don't know how this child has been coached. . . . And then, that leaves me and my client dead in the water which would be very unfair." *Id.* The trial court said it agreed with Gruber's attorney, adding that it was "clear" Headrick had "been trying to disenfranchise the child from Mr. Gruber." VRP (May 20, 2022) at 14. And the trial court told Gruber's attorney, "I think you've met your burden. I think you met your burden before we started this case." VRP (May 20, 2022) at 15.

The trial court then said it would have Headrick's attorney argue first. It explained that while normally, a petitioner goes first, it felt that Gruber had already met his burden, so "that would be a better place to start." VRP (May 20, 2022) at 17. Gruber's attorney said that if the trial court felt that Gruber had proved his case, she would not call Gruber to testify.

Headrick's attorney did not object, and he began his direct examination of Headrick. She testified that she attended school while Gruber supported her and AH financially. But otherwise,

4

No. 57171-4-II

"he wasn't there" when it came to supporting AH. VRP (May 20, 2022) at 20. Rather, he was in his room almost constantly, working, gaming, or talking to other people. Headrick said, "To get him to come out of his room, we had to . . . really twist his arm." *Id.* She said that the only thing Gruber "offered to take up on his own was" waking AH up and taking AH to school, but her partner had to step in because Gruber "couldn't do it." VRP (May 20, 2022) at 26.

Both Headrick and her partner testified about AH's homeschooling. Headrick said she had concerns about her ability to effectively homeschool AH, but Gruber "absolutely insisted" on taking responsibility for all the homeschooling duties. VRP (May 20, 2022) at 66. Even so, ultimately, Headrick "did everything." *Id.* She said Gruber "would come out maybe once a day, maybe every other day, and play a video on YouTube" for AH. *Id.* She explained that during a period when she was away from AH due to health challenges, her partner, a therapist for children with special needs, "stayed in the house and did the homeschooling himself." *Id.* Headrick's partner added that he made most of the household's meals while Headrick was ill.

Finally, Headrick testified that she wanted to move with AH to another state so she could be closer to her family. She said her sister had already secured a home for Headrick and AH where they could live for reasonable rent. But after Headrick's relationship with Gruber ended, Gruber bought a house in Clark County for Headrick and AH so he could "keep an eye on" Headrick. VRP (May 20, 2022) at 71. Despite Headrick's wishes to the contrary, she entered a contract to purchase the house and lived there: "If I didn't take the house and [Gruber] got de facto [parentage] and sued for custody, I wouldn't have had a home for my child." VRP (May 20, 2021) at 31. Gruber later asked Headrick to begin making payments on the house.

5

No. 57171-4-II

After Gruber's attorney had cross-examined both Headrick and her partner, the trial court said that while it would make a final decision after further research, it thought Gruber had met his burden. The court recognized the "imbalance of power" in the relationship between Gruber and Headrick, stating that Headrick "was in a situation where [Gruber] was the absolute [breadwinner] that she was dependent on for so many things." VRP (May 20, 2022) at 74. And the court expressed discomfort with the way it felt it had to apply the statutory scheme. The court said again that it did not need to hear from Gruber. Gruber did not testify and he was not subject to cross-examination.

In its final parentage order, the trial court concluded that Gruber was "a legal parent of the child with all the" accompanying rights and responsibilities. Clerk's Papers (CP) at 2. In its findings of fact and conclusions of law about de facto parentage, the trial court found that Gruber had lived with AH for more than half of AH's life and that the parties agreed Gruber was a regular member of AH's household, that Gruber had "provided consistent caretaking of" AH without expecting payment, and that Headrick had "fostered and supported the bonded and dependent relationship between [Gruber and AH] and encouraged the child to refer to and look to" Gruber as a father. CP at 7-8 (Finding of Fact (FF) 7-8, 11). Rather than specifically supporting each statutory element, the trial court's findings largely recited the elements and otherwise incorporated "[t]he [c]ourt records and files and testimony at trial," even though Headrick presented evidence and testimony to contradict Gruber's evidence. *Id.* The trial court did not make any credibility determinations.

Headrick appeals the final parentage order and the trial court's findings of fact and conclusions of law.

6

No. 57171-4-II

ANALYSIS

I. PROCEDURAL BARS TO APPEAL

For the first time on appeal, Headrick argues that "the trial court erred in its interpretation and implementation of . . . RCW 26.26A.440." Br. of Appellant at 19.

Gruber raises several procedural challenges to Headrick's appeal. He responds that Headrick "does not assign error to specific rulings . . . in violation of RAP 10.3(a)(4)," Br. of Resp't at 22, which requires a "separate concise statement of each error a party contends was made by the trial court." RAP 10.3(a)(4). Gruber also points out that "unchallenged findings of [fact] are verities on appeal." Br. of Resp't at 22. And Gruber asks us to hold that any error was invited because, through her conduct, Headrick agreed to the procedure the trial court employed.

We "may refuse to review any claim of error [that] was not raised in the trial court." RAP 2.5(a). But "a party may raise" a "manifest error affecting a constitutional right" for the first time on appeal. *Id.* The party must demonstrate actual prejudice through a "'plausible showing . . . that the asserted error had practical and identifiable consequences'" in the proceeding below. *State v. O'Hara*, 167 Wn.2d 91, 99, 217 P.3d 756 (2009) (internal quotation marks omitted) (quoting *State v. Kirkman*, 159 Wn.2d 918, 935, 155 P.3d 125 (2007)).

Parentage disputes implicate the fundamental right a parent has to autonomy in child-rearing under the Fourteenth Amendment to the United States Constitution. *In re Custody of B.M.H.*, 179 Wn.2d 224, 234, 315 P.3d 470 (2013); *In re Parentage of C.A.M.A.*, 154 Wn.2d 52, 57, 109 P.3d 405 (2005). Headrick has raised a manifest error affecting a constitutional right if she can demonstrate that the procedures the trial court employed wrongfully interfered with her

7

No. 57171-4-II

fundamental right to autonomy in raising AH and that those procedures had identifiable consequences in the proceeding.

While Gruber correctly notes that Headrick technically states issues rather than assigning error to specific trial court rulings, we will not decline to review issues on that basis. Addressing an argument for strict compliance with RAP 10.3(a), the Washington Supreme Court stated that "where the nature of the appeal is clear," the appellant argues the relevant issues in the body of the brief, and the appellant supplies citations "so that the court is not greatly inconvenienced and the respondent is not prejudiced, there is no compelling reason for the appellate court not to exercise its discretion to consider the merits of the case or issue." *State v. Olson*, 126 Wn.2d 315, 323, 893 P.2d 629 (1995). The body of Headrick's brief contains specific arguments supported by relevant citations. Additionally, while Headrick does not individually challenge any of the trial court's factual findings, her failure to do so does not prevent us from reviewing the adequacy of the procedures the trial court employed here.

Finally, we will not apply the invited error doctrine in this case. "The basic premise of the invited error doctrine is that a party who *sets up* an error at trial cannot claim that very action as error on appeal." *State v. Momah*, 167 Wn.2d 140, 153, 217 P.3d 321 (2009) (emphasis added). Because Headrick did not request the procedures the trial court used, she did not *set up* any error below. Thus, we turn to the merits of her arguments.

## II. DE FACTO PARENTAGE PROCEEDING

### A. Overview of RCW 26.26A.440

RCW 26.26A.440 provides procedures for adjudicating a claim of de facto parentage. First, the individual petitioning to be the child's de facto parent "must file an initial verified pleading

8

No. 57171-4-II

alleging specific facts that support the claim to parentage." RCW 26.26A.440(3)(a). Next, the child's parent, the child's legal guardian, or another adverse party may file a verified responsive pleading. RCW 26.26A.440(3)(b). Both parties can include sworn declarations and documentary evidence with their pleadings.

As a preliminary matter, if the pleadings raise conflicting facts material to the issue of the petitioner's standing, the trial court must hold an expedited hearing to determine those facts, separate from the proceeding to adjudicate parentage. RCW 26.26A.440(3)(c). But if the pleadings do not raise conflicting facts material to the issue of standing, the trial court can make a *standing* determination based only on the pleadings. *Id.*

If the trial court concludes that the petitioner has standing and has alleged facts that, if proven, would meet the statutory elements, the trial court then must hold "a proceeding to adjudicate parentage." RCW 26.26A.440(4). At that proceeding, RCW 26.26A.440(4)(a)-(g) requires a petitioner to prove by a preponderance of the evidence the listed elements of de facto parentage.

B.  Interpretation of RCW 26.26A.440(4)

Headrick argues that she did not receive a proper "proceeding to adjudicate parentage" under RCW 26.26A.440(4). She points out that the proceeding only involved testimony from herself and her partner and that she "was never permitted to cross-examine Gruber." Br. of Appellant at 23. Headrick also argues that RCW 26.26A.440 violates her Fourteenth Amendment procedural due process rights, as well as her Fourteenth Amendment liberty interest in the care, custody, and control of her child. We hold that the trial court failed to conduct a proper procedure

9

No. 57171-4-II

under RCW 26.26A.440 and that this error wrongfully interfered with Headrick's fundamental right to parent.

Our "'fundamental objective in determining what a statute means is to ascertain and carry out the legislature's intent.'" *In re Parentage of J.D.W.*, 14 Wn. App. 2d 388, 396-97, 471 P.3d 228 (2020) (quoting *Durant v. State Farm Mut. Auto. Ins. Co.*, 191 Wn.2d 1, 8, 419 P.3d 400 (2018)). We look first to the statute's plain meaning, considering "the text of the provision in question and the context of the statutory scheme as a whole." *Id.* at 397. "We must construe statutes consistent with their underlying purposes while avoiding constitutional deficiencies." *State v. Eaton*, 168 Wn.2d 476, 480, 229 P.3d 704 (2010).

The plain language of RCW 26.26A.440(3) and (4) is silent on what the full proceeding to adjudicate parentage must entail. The Uniform Parentage Act, chapter 26.26A RCW, does not provide additional context. The statute's legislative history and our case law do not give guidance either.[1]

A trial court "may 'adopt any suitable mode of proceeding to carry out a statutory directive where none is specifically pointed out and jurisdiction is otherwise conferred upon the court.'" *J.D.W.*, 14 Wn. App. 2d at 415 (quoting *Abad v. Cozza*, 128 Wn.2d 575, 588, 911 P.2d 376 (1996)). But that proceeding must comport with principles of procedural due process, which prevent the government from interfering with a person's fundamental rights without appropriate procedural

---

[1] Division Three has referred to the proceeding as "an evidentiary hearing on the merits." *In re Parentage of L.T.*, 25 Wn. App. 2d 260, 267, 522 P.3d 1040 (2023). And Division One held that an expedited hearing on standing to bring a de facto parentage petition must "give parties an opportunity to present relevant evidence and argument to the court with regard to the disputed facts at issue," *J.D.W.*, 14 Wn. App. at 415. Therefore, we can assume that a full proceeding to adjudicate parentage requires something more.

10

No. 57171-4-II

safeguards. *Id.*; *In re Pers. Restraint of Bush*, 164 Wn.2d 697, 704, 193 P.3d 103 (2008). And, as stated above, we "must construe statutes consistent with their underlying purposes while avoiding constitutional deficiencies." *Eaton*, 168 Wn.2d at 480. Therefore, in determining whether the proceeding below complied with RCW 26.26A.440(4), we must construe the statute in a manner that comports with the due process clause of the Fourteenth Amendment if possible.

    1.        <u>Procedural due process principles</u>

The Fourteenth Amendment forbids states from depriving "any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV, § 1. At minimum, due process requires "that absent a countervailing state interest of overriding significance, persons forced to settle their claims of right and duty through the judicial process must be given a meaningful opportunity to be heard." *Boddie v. Connecticut*, 401 U.S. 371, 377, 91 S. Ct. 780, 28 L. Ed. 2d 113 (1971). To determine whether procedures that interfere with a person's fundamental rights satisfy the requirements of the Fourteenth Amendment, we apply the balancing test from *Mathews v. Eldridge*.[2] *In re Welfare of M.B.*, 195 Wn.2d 859, 868, 467 P.3d 969 (2020). We balance three factors: (1) the private interest at stake, (2) the risk that the procedures in place will cause an erroneous deprivation of that private interest and the probable value of additional procedural safeguards, and (3) the government's interest, including the fiscal and administrative burdens the additional safeguards would impose. *Mathews*, 424 U.S. at 335.

A parent's right to make decisions regarding their child's care "'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court.'" *M.B.*, 195 Wn.2d at 868 (alteration in original) (quoting *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054,

---

[2] 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

No. 57171-4-II

147 L. Ed. 2d 49 (2000) (plurality opinion)). A requirement that someone other than the legal parent has certain rights in relation to the child will necessarily infringe on a fit legal parent's fundamental right to make unhampered decisions regarding the care, custody, and control of their children. *Troxel*, 530 U.S. at 72-73 (recognizing that requiring grandparent visitation over the objection of the legal parent violated the fit parent's fundamental right to make decisions with regard to the care, custody, and control of their children).

Thus, the Washington Supreme Court has generally held that the first *Mathews* factor weighed in favor of requiring robust procedural protections when the right to parent was at stake. *See M.B.*, 195 Wn.2d at 869 (first factor weighed "in favor of any reasonable error-reducing procedure" where trial court held parental rights termination proceeding largely without incarcerated father present); *In re Welfare of D.E.*, 196 Wn.2d 92, 103, 469 P.3d 1163 (2020) (under first factor, a child and their parent share a strong interest in preventing erroneous termination of the parent-child relationship); *Aiken v. Aiken*, 187 Wn.2d 491, 502, 505, 387 P.3d 680 (2017) (first factor weighed in favor of allowing cross-examination of the appellant's daughter in hearing for one-year protection order that covered her, although cross-examination was ultimately not permitted).

Under the second factor, the risk of an erroneous deprivation of the right to parent without interference is high where the parent cannot meaningfully challenge the adverse party's evidence and the proceeding's outcome depends on subjective standards. *See M.B.*, 195 Wn.2d at 869. In *M.B.*, the Washington Supreme Court held that an incarcerated father "did not receive due process of law before his parental rights were terminated" where the trial court held the termination proceeding mostly without him and he was only able to testify by phone. *Id.* at 878. Applying the

No. 57171-4-II

second *Mathews* factor, the court concluded "that a meaningful opportunity to be heard in a parental termination case includes the opportunity to hear the State's evidence and consult with counsel." *Id.* at 874. "Because the outcome of a parental termination hearing turns on a subjective standard and a parent has some of the most intimate knowledge of the facts that bear on that standard, their inability to aid counsel in scrutinizing the State's evidence creates a significant risk of error." *Id.* Further, this factor allows consideration of the value that the proposed procedural safeguard would add. *Id.* at 869.

Under the third factor, in cases that directly impact children's home lives, the government has an interest in the children's wellbeing and in just, accurate outcomes. *See In re Dependency of M.S.R.*, 174 Wn.2d 1, 20, 271 P.3d 234 (2012) (parental rights termination proceeding); *In re Dependency of A.W.*, 24 Wn. App. 2d 76, 86, 519 P.3d 262 (2022) (motion to take allegedly dependent child into state custody). This factor also includes consideration of the fiscal and administrative burdens the proposed procedure would impose. *See D.E.*, 196 Wn.2d at 108.

2.      De facto parentage proceeding requirements

Here, we must interpret RCW 26.26A.440(4) in conformance with due process principles. We conclude that in a proceeding to adjudicate de facto parentage where there are disputed material facts, the full adjudicative hearing contemplated under the statute must include an opportunity for the petitioner to testify and be cross-examined.

The first *Mathews* factor, the private interest at stake, weighs in favor of requiring this procedural safeguard as part of a full adjudication. As stated above, parentage disputes implicate a legal parent's fundamental right to autonomy in child-rearing, protected by the Fourteenth Amendment. While the recognition of a de facto parent does not interfere with this fundamental

13

No. 57171-4-II

right to the same extent that outright termination of parental rights does, the Supreme Court has held that the first *Mathews* factor weighed in favor of finding a due process violation even where the interference with the right to parent lasted for a year. *Aiken*, 187 Wn.2d at 502. A de facto parent would interfere with the legal parent's rights for as long as their child is a minor because the de facto parent would maintain enforceable rights to co-parent so long as they remain fit.

The second *Mathews* factor, the risk of erroneous deprivation, also weighs in favor of requiring a full adjudication to include testimony from the petitioner and an opportunity for cross-examination. If the petitioner does not testify and the legal parent cannot cross-examine them, the legal parent cannot meaningfully challenge the petitioner's evidence. As the *M.B.* court noted, courts "have long recognized the significance of in-person testimony" because "a fact finder who observes a witness in person is better able to judge their credibility." 195 Wn.2d at 871. While a legal parent can respond to a petitioner's allegations by filing a responsive pleading, they cannot adequately challenge the veracity of those allegations without cross-examination. And if the petitioner does not testify, the judge has no opportunity to evaluate the petitioner's credibility themselves.

The nature of the inquiry a trial court must undertake makes it especially likely for a lack of testimony from the petitioner to cause an erroneous deprivation. Like the parental termination proceeding in *M.B.*, the outcome of a de facto parentage proceeding turns on subjective standards, and the legal parent—along with the petitioner—"has some of the most intimate knowledge of the facts that bear on" those standards. *Id.* at 874. It is one thing for a petitioner to allege in writing that, for example, they "established a bonded and dependent relationship with the child which is parental in nature." RCW 26.26A.440(4)(e). It is another thing entirely for a petitioner to testify

14

No. 57171-4-II

that they established that relationship and to be cross-examined on the subject by a person who is intimately familiar with the facts.

Finally, the third *Mathews* factor, the government's interest, weighs in favor of our interpretation. In a case determining whether an individual will gain the right to parent a child, the government has an interest in the child's wellbeing and in a just, accurate outcome. *See* RCW 26.26A.440(4)(g) (stating that the petitioner must prove that continuing their relationship with the child is in the child's best interest). The petitioner's testimony and the legal parent's cross-examination of the petitioner would facilitate such a just outcome by giving the trial court a basis for evaluating the petitioner's credibility. An opportunity to evaluate the petitioner's credibility and answers under cross-examination is especially important where the nature of the relationship with the child is contested because a petition for de facto parent status can be used as a tool for manipulation and control over the legal parent, as the trial court recognized here. And given that the statute plainly requires a proceeding, requiring the petitioner to testify and be subject to cross-examination in that proceeding would impose minimal additional fiscal and administrative burdens.

Because all three *Mathews* factors weigh in favor of doing so, we hold that a proceeding to adjudicate parentage under RCW 26.26A.440(4) involving disputed material facts, at the very least, requires the petitioner to testify and the legal parent to have the opportunity to cross-examine the petitioner.

C.     Hearing Afforded the Parties in This Case

Here, the trial court's procedure did not give Headrick, the legal parent, a meaningful opportunity to be heard. The case involved disputed material facts, and while the trial court allowed

15

No. 57171-4-II

Headrick and her partner to testify, it neither required Gruber to testify nor permitted Headrick to cross-examine Gruber. Nor did the trial court make credibility determinations or make meaningful factual findings. *See, e.g., In re Dependency of W.W.S.*, 14 Wn. App. 2d 342, 363, 469 P.3d 1190 (2020) (in dependency cases, findings of fact that parrot statutory requirements are invalid if they lack the specificity necessary for meaningful appellate review).

Adjudicating Gruber's parentage required the trial court to resolve factual disputes that hinged on credibility determinations. A person petitioning to be a de facto parent must demonstrate that they "engaged in consistent caretaking of the child." RCW 26.26A.440(4)(b). Additionally, the petitioner must demonstrate that they "undertook full and permanent responsibilities of a parent of the child without expectation of financial compensation." RCW 26.26A.440(4)(c).

In his petition, Gruber alleged that while AH was living with him, he provided many forms of "emotional and material support," such as making meals, playing with AH, and giving at-home educational support. Ex. 1, at 15. And Gruber alleged that when Headrick had health challenges, he "was present for" and "comforted" AH. *Id.* at 16.

But in the proceeding, Headrick and her partner provided testimony that directly contradicted Gruber's allegations. Headrick said that while Gruber supported her and AH financially, he was in his room almost constantly, working, gaming, or talking to other people. As a result, Headrick's partner "had to step in." VRP (May 20, 2022) at 26. In particular, Headrick said that when AH was homeschooled, Gruber "insisted that he would be able to do all of the homeschool duties himself" but ultimately, she "did everything." VRP (May 20, 2022) at 66. And according to Headrick's and her partner's testimonies, Headrick's partner took over homeschooling and feeding AH when she was away from the home due to health challenges.

16

No. 57171-4-II

Because Gruber did not testify, the trial court did not have an opportunity to determine his credibility. Although Gruber submitted exhibits demonstrating his involvement at AH's school, his petition alleged far more involvement in AH's upbringing. Had Gruber testified about that involvement, the trial court could have evaluated whether Gruber or Headrick provided a more accurate picture of AH's relationship with Gruber. Additionally, because Gruber did not testify, Headrick's attorney lacked the opportunity to cross-examine him. Gruber was able to put Headrick's credibility at issue when his attorney cross-examined Headrick, but Headrick had no opportunity to do the same. This error was not harmless because meaningful cross-examination could have undermined Gruber's allegations that he met the contested elements. This is especially true where, as the trial court recognized, a petition for de facto parent status could be a tool for manipulation and control over the legal parent.

We reverse the trial court's adjudication of Gruber as Headrick's de facto parent and remand for further proceedings consistent with this opinion. On remand, the trial court must first evaluate whether Gruber has standing to bring a de facto parentage petition and whether an expedited hearing on standing is necessary. If the trial court concludes that Gruber has standing, the trial court must then hold a full proceeding to adjudicate parentage. Because there are issues of material fact in dispute, the trial court must ensure that Gruber testifies and that Headrick has the opportunity to cross-examine him in any full adjudication.[3] The trial court must then enter findings that specifically explain how the elements are or are not satisfied in light of the facts.

---

[3] Because we have applied the principle that we must interpret relevant statutes to preserve their constitutionality, we reject Headrick's argument that the de facto parentage statute is facially unconstitutional. We also need not reach whether the trial court properly found that granting Gruber de facto parent status was in the child's best interest. We decline to make this determination in the absence of a proper full adjudication below.

17

No. 57171-4-II

### III. GUARDIAN AD LITEM APPOINTMENT

Headrick argues that the trial court abused its discretion by failing to appoint a guardian ad litem for AH. Gruber responds that "RCW 26.26A.440 does not require the appointment of a guardian ad litem." Br. of Resp't at 30. Gruber adds that Headrick did not move to appoint a guardian ad litem before or during the proceeding.

We "review a trial court's determination of the need for a guardian ad litem for an abuse of discretion." *Vo v. Pham*, 81 Wn. App. 781, 784, 916 P.2d 462 (1996). A trial court abuses its discretion "'when its decision is manifestly unreasonable or based on untenable grounds.'" *Id.* (quoting *Woodhead v. Disc. Waterbeds, Inc.*, 78 Wn. App. 125, 131, 896 P.2d 66 (1995)). "'A decision is based on untenable grounds or for untenable reasons if the trial court applies the wrong legal standard or relies on unsupported facts.'" *Salas v. Hi-Tech Erectors*, 168 Wn.2d 664, 669, 230 P.3d 583 (2010) (quoting *In re Pers. Restraint of Duncan*, 167 Wn.2d 398, 402-03, 219 P.3d 666 (2009)).

With exceptions that do not apply here, in a proceeding to adjudicate parentage, the trial court "*shall* appoint a guardian ad litem" for the child if it "finds that the interests of the child are not adequately represented." RCW 26.26A.485(2) (emphasis added).

Here, the trial court asked if either party wanted it to appoint a guardian ad litem, and Headrick's attorney responded affirmatively. *See* VRP (May 20, 2022) at 13 ("Absolutely, Your Honor"). The trial court decided not to appoint one, but our record contains no oral or written ruling on the issue. The record suggests that the trial court concluded AH might have been unduly influenced by Headrick's opposition to Gruber's de facto parentage petition, although there is no information showing that Headrick made negative statements to AH about Gruber. *See* VRP (May

18

No. 57171-4-II

20, 2022) at 14 ("[I]t's clear [Headrick has] been trying to disenfranchise the child from Mr. Gruber."). The record also suggests that the trial court may have believed, at the outset of the proceeding, that Gruber's petition had already proved he was AH's de facto parent. *See* VRP (May 20, 2022) at 15 ("I think you met your burden before we started this case."). This would have been an improper basis for declining to appoint a guardian ad litem because 26.26A.485(2) required the trial court to consider whether AH's interests were otherwise adequately represented rather than considering the strength of Gruber's case.

Given that our record does not contain enough information to review the trial court's reason for declining to appoint a guardian ad litem, we direct the trial court to revisit this issue on remand and apply the appropriate standard. The trial court must consider on the record whether appointment is necessary to adequately represent AH's interests.

CONCLUSION

We reverse the trial court's adjudication of Gruber as AH's de facto parent and remand for further proceedings consistent with this opinion. On remand, the trial court must evaluate whether Gruber has standing to bring a de facto parentage petition and whether an expedited hearing on standing is necessary. If the trial court concludes that Gruber has standing, the trial court must then proceed to a full proceeding to adjudicate parentage. At the proceeding, because there are issues of material fact, the trial court must ensure that Gruber testifies and that Headrick has the opportunity to cross-examine him. The trial court must also revisit the appointment of a guardian ad litem for AH on remand and consider on the record whether appointment is necessary to adequately represent AH's interests.

19

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 57171-4-II

We recognize that there may have been subsequent trial court orders establishing residential time for AH. Any current residential provision for the child remains as a temporary order until the parties return to the superior court and have a new order entered consistent with this opinion.

Glasgow, C.J.

We concur:

Veljacic, J.

Che, J.