**FILE**

IN CLERK'S OFFICE
SUPREME COURT, STATE OF WASHINGTON
JULY 23, 2020

*Stephe, C.J.*
CHIEF JUSTICE

THIS OPINION WAS FILED
FOR RECORD AT 8 A.M. ON
JULY 23, 2020

*Susan L. Carlson*
SUSAN L. CARLSON
SUPREME COURT CLERK

# IN THE SUPREME COURT OF THE STATE OF WASHINGTON

| | | |
|---|---|---|
| In the Matter of the Welfare of | ) ) ) ) ) | No. 97731-3 |
| M.B., | ) ) ) | |
| A minor child. | ) ) ) ) | En Banc |
| | ) | Filed _____ July 23, 2020 _____ |

GONZÁLEZ, J.— When the State seeks to terminate a parent-child relationship, it must do so using fundamentally fair procedures that satisfy due process of law. In this case, the juvenile court terminated N.B.'s parental rights to his son while N.B. was incarcerated. N.B. made clear that he strongly desired to participate in the termination trial by phone or in person. Despite this, most of the three-day trial occurred in his absence. N.B. was allowed to appear only by phone and for only a portion of the third day. Under the circumstances, this was not fair and violated due process. We reverse and remand for a new trial.

1

FACTS

M.B. was born in October 2015 while his father, N.B., was incarcerated. N.B. learned about M.B. when M.B. was about six months old, and N.B.began the process of establishing paternity. In the meantime, the Department of Social and Health Services (Department)[1] placed M.B. in a nonrelative foster home, and the juvenile court found him dependent.

N.B. suffered from severe amphetamine and opiate use disorders, and for much of the dependency, he was serving a drug offender sentencing alternative (DOSA), which allowed him to live in the community under the Department of Corrections' (DOC) supervision. During the dependency, N.B. completed intensive outpatient treatment for chemical dependency, participated in a psychological evaluation, and started therapy with a mental health counselor. He also regularly visited M.B. and tried to obtain either custody of or a family placement for M.B.. N.B. continued to struggle with methamphetamine addiction, did not complete all court-ordered services, and eventually relapsed. In October 2017, the Department filed a motion to terminate the parent-child relationship. In May 2018, N.B. violated the conditions of his DOSA, and it was revoked the following month. He returned to total confinement in August 2018 with a release date of February 2019.

---

[1] By the time of trial, child welfare functions were transferred from the Department of Social and Health Services to the Department of Children, Youth, and Families. *See* RCW 43.216.906. We use "the Department" to encompass both.

The termination trial was initially set for April 25, 2018, but the court granted a continuance to June 13, 2018 because the assistant attorney general (AAG) had scheduling conflicts until then. The Department obtained a second continuance to June 20, 2018 to explore a change to M.B.'s permanency plan. When no change was made to M.B.'s permanency plan, the Department obtained two more continuances to prepare for trial, which was at last set for September 5, 2018. The four motions to continue were agreed on by the parties.

Unfortunately, N.B.'s attorney had not been able to arrange for N.B.'s presence, and, when the parties appeared on September 5, N.B.'s attorney moved for a continuance and an order for transport. N.B.'s attorney had attempted to arrange for N.B. to participate telephonically, but staff at the correctional center declined to cooperate. The AAG did not object to a brief continuance to facilitate N.B.'s transport from Larch Corrections Center in southwest Washington to Pierce County for trial, but the AAG opposed a lengthy delay. The court continued the trial until Tuesday, September 11, 2018 and signed an order requesting DOC to transport N.B. for trial by September 10th.

DOC did not transport N.B. The court issued a new transport order, but because of the busy schedules of the witnesses who were present, the court suggested trial begin in the meantime to take their testimony. The court wanted to wait, however, to take the testimony of the primary witnesses—the social worker and the

guardian ad litem (GAL)—until N.B. was present. N.B.'s attorney did not object. The parties proceeded to trial, and the court heard testimony from N.B.'s chemical dependency counselor and his mental health counselor. N.B.'s counsel cross-examined both witnesses.

When the parties appeared the following week for trial to resume, N.B.'s attorney informed the court that the earliest DOC would transport N.B. was September 27, 2018. This was inconvenient for the court because September 27 was the day before a one-week recess and it wanted to finish trial before then. N.B.'s counsel again emphasized N.B.'s strong desire to be present and advocated for "whatever it would take to get him present." 4 VRP (Sept. 18, 2018) at 93. The AAG was concerned that continuing the matter to a date after September 27 would compromise the child's chance for permanency. The court decided to proceed that day and to take N.B.'s testimony by phone. That day, the trial resumed with the direct testimony and partial cross-examination of the social worker, and the full testimony of various DOC community corrections officers and the psychologist who performed N.B.'s psychological evaluation. All were cross-examined by N.B.'s counsel.

The next day, at last, N.B. appeared and testified telephonically. After testifying, N.B. remained on the phone for the last 30 minutes of his attorney's cross-examination of the social worker and for the testimony of the GAL, which lasted

about three minutes. The parties rested and, at the direction of the court, N.B. hung up the phone. The record does not suggest N.B. was given the opportunity to consult with his attorney about the proceedings, and when proceedings reconvened in the afternoon for closing arguments, N.B. was not on the phone.

In closing argument, the State contended, among other things, that N.B.'s parental deficiencies were not likely to be remedied in the foreseeable future because of his relapse and incarceration. The State argued N.B.'s actions showed he would not be able to overcome his addiction. N.B. argued he had been fighting to recover and pointed to evidence that 93 percent of people who suffer from methamphetamine addiction relapse after treatment. Emphasizing his will to overcome failure, his strong parenting abilities, and the bond he shares with M.B., N.B. argued that if allowed to continue visitation, drug treatment, and therapy, he could remedy his deficiencies in the near future.

The court terminated N.B.'s parental rights. N.B. appealed, arguing the court violated due process by holding trial largely without him. The Court of Appeals Division Two commissioner affirmed, concluding that representation by counsel was a sufficient procedural safeguard under the circumstances. A panel of judges denied N.B.'s motion to modify. We granted review. Order, No. 97731-3 (Wash. Jan. 8, 2020). The Washington Defender Association's Incarcerated Parents Project filed an amicus brief in support of N.B.

ANALYSIS

N.B. argues he was denied due process of law when his parental rights were terminated after a trial that was held largely in his absence over his strongly expressed desire to be present. We review alleged violations of due process de novo. *See In re Welfare of A.W.*, 182 Wn.2d 689, 701, 344 P.3d 1186 (2015).

Our constitution promises both substantive and procedural due process before the State may lawfully take a person's life, liberty, or property. *State v. A.N.J.*, 168 Wn.2d 91, 97, 225 P.3d 956 (2010) (quoting *Gideon v. Wainwright*, 372 U.S. 335, 344, 83 S. Ct. 792, 9 L. Ed. 2d 799 (1963)). Procedural due process requires the government to meet certain constitutional minimum standards before it may lawfully make decisions that affect an individual's liberty interests. *Mathews v. Eldridge*, 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Parents have a fundamental liberty interest in the care and custody of their children, and so when the State seeks to terminate parental rights, "it must provide the parents with fundamentally fair procedures." *Santosky v. Kramer*, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion). Due process protections include a strict burden of proof, the right to notice and an opportunity to be heard and defend, and the right to the assistance of counsel. *See In re Welfare of Sego*, 82 Wn.2d 736, 738-39, 513 P.2d 831 (1973); *In re Welfare of Messmer*, 52

Wn.2d 510, 514, 326 P.2d 1004 (1958) (quoting *In re Welfare of Petrie*, 40 Wn.2d 809, 812, 246 P.2d 465 (1952)); RCW 13.34.090.

We have not previously addressed whether due process also requires an incarcerated parent's physical presence at a termination trial. Other courts have concluded due process does not give an incarcerated parent an absolute right to appear in person. *See, e.g.*, *In re Adoption/Guardianship No. 6Z980001*, 131 Md. App. 187, 193 n.2, 748 A.2d 1020 (2000) (collecting cases); *In re Welfare of L.R.*, 180 Wn. App. 717, 724, 324 P.3d 737 (2014) (finding due process was satisfied by a parent's telephonic participation). We agree. But if an incarcerated parent is not physically present, they must be given a meaningful opportunity to be heard and defend through alternative procedures.

To determine whether alternative procedures satisfy due process, we use the balancing test set forth in *Mathews*. 424 U.S. at 335; *Santosky*, 455 U.S. at 754. Under this test, the court balances (1) the private interests affected, (2) the risk of error created by the procedures used and the probable value of any additional procedural safeguards, and (3) the State's interest in using the challenged procedure. *Mathews*, 424 U.S. at 335. Balancing the *Mathews* factors in this case, we conclude N.B. did not receive due process of law.

I. *The private interests affected*

The first *Mathews* factor is the nature and weight of the private interests affected by the challenged government action. 424 U.S. at 335.

The private interest here, the right to parent, "is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme Court]," *Troxel v. Granville*, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion), and "does not evaporate simply because [a parent has] . . . lost temporary custody of their child to the State," *Santosky*, 455 U.S. at 753. Termination severs that fundamental liberty. *Id.* at 759. Few forms of state action are "so severe and so irreversible." *Id.* Courts thus "undertake a grave responsibility" when they decide whether to terminate parental rights. *In re Welfare of Sego*, 82 Wn.2d at 738 (citing *Lovell v. House of Good Shepherd*, 9 Wash. 419, 37 P. 660 (1894)). Because of the tremendous stakes, "a parent's interest in the accuracy and justice of the decision" is "commanding." *Santosky*, 455 U.S. at 759.

The private interests of a child are also at stake in a termination proceeding. *Id.* at 760. Until the State proves parental unfitness, a child *shares* their parent's interest in an accurate and just decision. *Id.* These private interests are enormous and weigh in favor of any reasonable error-reducing procedure. *Id.* at 761.

II.    *Risk of erroneous result from procedures used*

Next we evaluate the risk of erroneous deprivation of the interest at stake through the procedures used and the probable value, if any, of additional safeguards. *Mathews*, 424 U.S. at 335.

We find that N.B.'s limited participation in the trial increased the risk of erroneous termination in two ways: first, N.B. was not able to testify in person and communicate with the court in the same manner as the State's witnesses, and second, he was unable to meaningfully review and challenge the State's evidence. As the United States Supreme Court explained in *Santosky*, several features of parental termination proceedings already magnify the risk of error. 455 U.S. at 762. N.B.'s inability to testify in person and to aid his counsel, especially when coupled with the features identified in *Santosky*, created a significant possibility of erroneous termination.

As the Court explained in *Santosky*, the risk of error is already significant in termination proceedings because they

> employ imprecise substantive standards that leave determinations unusually open to the subjective values of the judge. See *Smith* v. *Organization of Foster Families*[ *for Equal. & Reform*], 431 U.S.[ 816], 835, n.36[, 97 S. Ct. 2094, 53 L. Ed. 2d 14 (1977)]. In appraising the nature and quality of a complex series of encounters among the agency, the parents, and the child, the court possesses unusual discretion to underweigh probative facts that might favor the parent. Because parents subject to termination proceedings are often poor, uneducated, or members of minority groups, *id.*, at 833-835, such proceedings are often vulnerable to judgments based on cultural or class bias.

*Santosky*, 455 U.S. at 762-63 (footnote omitted). Indeed, to terminate parental rights in Washington, the court must find that the State has offered a parent all necessary services that are reasonably available and capable of correcting parental deficiencies, that a parent is not likely to remedy parental deficiencies in the near future, and that termination is in the best interests of the child. *See* RCW 13.34.180(1)(d), (e); *In re Welfare of A.B.*, 168 Wn.2d 908, 911-12, 232 P.3d 1104 (2010). Evaluating whether these standards are met may involve assessing a parent's commitment to treatment for chemical dependency or mental health issues. *See* RCW 13.34.180(1)(e)(i)-(ii). In this case, the court was largely tasked with deciding whether N.B. could likely maintain recovery from drug addiction so he could safely parent M.B. in the near future. As explained in *Santosky*, this is the type of inquiry that gives judges an unusual level of discretion and is particularly vulnerable to subjective judgments.

The Court in *Santosky* also concluded the risk of error is heightened because of the balance of power in termination proceedings:

> The State's ability to assemble its case almost inevitably dwarfs the parents' ability to mount a defense. . . . [T]he primary witnesses at the hearing will be the agency's own professional caseworkers whom the State has empowered both to investigate the family situation and to testify against the parents. Indeed, because the child is already in agency custody, the State even has the power to shape the historical events that form the basis for termination.

455 U.S. at 763. The enormous power of the State to structure the evidence presented in termination proceedings is evident in this case, where N.B. claims he sought placement of M.B. with his family but the Department maintained

nonrelative foster care. The State's placement decisions during a dependency may strongly influence later substantive determinations like whether termination is in the child's best interests.

Because N.B. was not transported from prison for the trial, he had to testify over the phone and not in person, unlike the State's key witnesses. Therefore, the trial court was not able to evaluate his demeanor and credibility in the same way it could evaluate that of the State's witnesses. Courts have long recognized the significance of in-person testimony. William Blackstone observed centuries ago that "'[by] examination of witnesses *viva voce*, in the presence of all mankind, . . . and this [method] only, the persons who are to decide upon the evidence have an opportunity of observing the quality, age, education, understanding, behaviour, and inclinations of the witness.'" *Whitesides v. State, Dep't of Pub. Safety, Div. of Motor Vehicles*, 20 P.3d 1130, 1136 (Alaska 2001) (alterations in original) (quoting 3 WILLIAM BLACKSTONE, COMMENTARIES *373). Because we recognize that a fact finder who observes a witness in person is better able to judge their credibility, we give deference to many trial court determinations, including parental termination decisions. *See id.*; *In re Parental Rights to K.M.M.*, 186 Wn.2d 466, 477, 379 P.3d 75 (2016). Recognizing that the "potential for empathy and nuanced understanding is much greater in person-to-person communications," the Supreme Court of Alaska has concluded drivers are entitled to an in-person hearing, as opposed to a telephonic

one, before license revocations if the driver's credibility is material. *Whitesides*, 20 P.3d at 1137, 1132. In so holding, the court concluded phone communication compromises an individual's ability to convey they are telling the truth. *Id*. at 1137, 1132.

In parental termination proceedings, where the State is already advantaged and where the outcome largely turns on subjective standards, the benefits of nuanced communication and an increased ability to convey truth-telling are particularly important for a parent. *See In re Involuntary Termination of Parent-Child Relationship of C.G.*, 954 N.E.2d 910, 920 (Ind. 2011) (there are risks when "a party in such a delicate proceeding is not transported to the hearing" and the judge is "not as easily able to ascertain [their] credibility"). Testimony in person not only bolsters the accuracy of a credibility assessment but also reduces the risk of error by "'impress[ing] the factfinder with the importance of the decision.'" *Santosky*, 455 U.S. at 764-65 (describing the effect of a heightened standard of proof in parental termination proceedings) (quoting *Addington v. Texas*, 441 U.S. 418, 427, 99 S. Ct. 1804, 60 L. Ed. 2d 323 (1979)).

N.B.'s absence from trial also deprived him of the opportunity to hear the vast majority of the State's evidence and assist his attorney in responding. When N.B. appeared telephonically, he heard only the testimony of the GAL and a portion of the cross-examination of the social worker. He was absent for the testimony of the

six other witnesses, and the social worker's contribution to the Department's case-in-chief, arguably the most important part of the case. He missed testimony on his compliance with court-ordered services, his addiction and relapses, his relationship with his son, his ability to parent, his DOC violations, and myriad other subjects. Because N.B. has intimate knowledge of these subjects, he was in the best position to help counsel identify inaccuracies in the State's evidence and any additional evidence that could be used in his defense. *See Orville v. Div. of Family Servs.*, 759 A.2d 595, 600 (Del. 2000). Even though he heard limited testimony from the social worker and the GAL, he had no opportunity to consult with his attorney afterward. Depriving him of the ability to hear the vast majority of the Department's evidence and to advise counsel on any inaccuracies in the testimony increased the risk of error.

For this reason, other state courts have held an incarcerated parent's right to due process includes an opportunity to have actual knowledge of the State's evidence, to consult with counsel, and then to present evidence. *See In re M.D.*, 921 N.W.2d 229, 236 (Iowa 2018); *Orville*, 759 A.2d at 600; *State ex rel. Children, Youth & Families Dep't v. Ruth Anne E.*, 1999-NMCA-035, ¶ 25, 126 N.M. 670, 974 P.2d 164. *But see In Interest of Darrow*, 32 Wn. App. 803, 807-08, 649 P.2d 858 (1982) (finding representation by counsel and the opportunity to give testimony by deposition was enough to satisfy due process). For example, in *Orville*, the Delaware Supreme Court held due process was violated when a parent, incarcerated

out of state, was absent from trial and participated by phone only to give her testimony. 759 A.2d 595 at 600. The Supreme Court concluded "due process requires that an incarcerated parent have an opportunity to have actual knowledge of the evidence presented in support of the petition to terminate before [they are] called upon to present a defense." *Id.* Therefore, the trial court should have continued the proceeding for a brief time until Orville could participate by phone during the entire hearing. Alternatively, the court could have continued the hearing after the presentation of the State's evidence and given Orville the opportunity to review transcripts of the State's evidence before presenting her own case and recalling witnesses for additional cross-examination at a reconvened telephonic hearing. *Id.*; *see also S.L. v. Ind. Dep't of Child Servs.*, 997 N.E.2d 1114, 1121 (Ind. Ct. App. 2013) (where federal authorities would not release incarcerated father, due process was satisfied because he was given transcripts of the State's evidence and time to respond); *In re C.G.*, 954 N.E.2d at 921 (where the mother was incarcerated out of state, due process was satisfied when she participated in the entire hearing telephonically, had the opportunity to consult privately with counsel throughout the proceedings, and trial was bifurcated so she could review the State's evidence with counsel before responding); *In re Application to Adopt J.M.D.*, 41 Kan. App. 2d 157, 171, 202 P.3d 27 (2009), *rev'd on other grounds*, 293 Kan. 153, 260 P.3d 1196 (2011) (where out-of-state officials refused to comply with a writ of habeas corpus

to produce incarcerated parent, due process was satisfied when parent participated in the entire trial by phone and received breaks to consult in private with counsel); *In re James Carton K.*, 245 A.D.2d 374, 377, 665 N.Y.S.2d 426 (1997) (where federal authorities would not release incarcerated father, due process was satisfied when he participated via review of transcripts and over the phone when possible); *In re A.P.*, 692 A.2d 240, 243-44 (Pa. Super. Ct. 1997) (due process was satisfied where incarcerated parent participated in entire hearing by phone); *In re Juvenile Appeal*, 187 Conn. 431, 437, 446 A.2d 808 (1982) (due process was satisfied when incarcerated parent had the opportunity to review transcripts of the State's evidence and then testify by phone).

We agree that a meaningful opportunity to be heard in a parental termination case includes the opportunity to hear the State's evidence and consult with counsel. Because the outcome of a parental termination hearing turns on a subjective standard and a parent has some of the most intimate knowledge of the facts that bear on that standard, their inability to aid counsel in scrutinizing the State's evidence creates a significant risk of error.[2]

---

[2] We recognized that it is important for a parent to have the opportunity to speak confidentially with their attorney after a witness's direct examination and before their cross-examination when, in our emergency COVID-19 orders, we made that a requirement in contested video or telephonic termination trials. *See* Gen. Order 25700-B-622 of Wash. Supreme Ct., *In re Statewide Response by Washington State Courts to the COVID-19 Public Health Emergency— Extended and Revised Order Re: Dependency and Termination Cases* (Apr. 30, 2020) at 3 http://www.courtswa.gov/content/PublicUpload/Supreme%20Court%20Orders/Supreme%20Cou rt%20Order%20Dependency%20Termination%20Cases.pdf.

The State argues that because the trial occurred over multiple days, N.B.'s counsel could have consulted with him about any evidence presented in his absence and could have asked to recall the State's witnesses. Suppl. Br. of Resp't at 16-17. Similarly, the Court of Appeals concluded "counsel was able to . . . discuss proceedings throughout." Comm'r's Ruling Affirming Order Terminating Parental Rights, *In re Welfare of M.B.*, No. 52632-8-II (Wash. Ct. App. June 4, 2019), at 7. But the record shows that, to the contrary, N.B.'s counsel had difficulty communicating with him. She repeatedly told the court she was having problems contacting N.B.'s counselor at the prison and was thus unable to speak with N.B. Nothing in the record suggests that despite N.B.'s physical absence from trial, the court employed alternative procedures for N.B. to review the State's evidence and consult with counsel about recalling witnesses for additional cross-examination.

The State also likens the procedures used in this case to those in *In re Welfare of L.R.*, 180 Wn. App. 717, where the Court of Appeals held an incarcerated mother's due process rights were not violated when she was absent from the first day of trial but participated in the rest of trial by phone. The trial court allowed recesses between each witness for the mother to confer with her attorney, and on the last day of trial, the mother's attorney recalled the witness from the first day and conducted another cross-examination. *Id.* at 722. While noting the better course of action would have

been to continue the trial, the Court of Appeals held the risk of error was low because the mother was represented by counsel to defend her when she was not present, was able to privately consult with counsel between witnesses when she was, and was able to recall the single witness she missed and cover topics previously addressed. *Id*. at 726. Unlike in *L.R.*, N.B. missed essentially the entire presentation of the State's evidence and was afforded no alternative means to review that evidence and contribute to his defense.

### III. *The government's interest*

Finally, we must consider the government's interest in the procedures used and the burdens that additional procedures would entail.

The State has an important interest in the welfare of a child in its custody. An unwarranted delay in finality could potentially damage a child's chance for permanency and stability. *See* RCW 13.34.020 (declaring a child's interest in a speedy resolution of dependency and termination proceedings). We recognize that children kept in "legal limbo" suffer much "mental and emotional strain." *In re Dependency of M.H.P.*, 184 Wn.2d 741, 762, 364 P.3d 94 (2015). For this reason, we strive to quickly resolve parental termination cases. *See* Wash. Supreme Court, Internal Procedures Manual of Washington State Supreme Court, Rule II-5(A)(3)(revised Apr. 4, 2019), https://www.courts.wa.gov/content/

publicUpload/Supreme%20Court%20Documents/SupremeCourtInternalRules.pdf;

*see also* RAP 18.13A. The State also has an interest in avoiding burdensome costs and security risks involved in transporting an incarcerated parent.

In this case, the State did not argue that transporting N.B. would be too costly or pose unreasonable security risks. That accords with common sense because N.B. was incarcerated at a correctional facility on the same side of the state and was serving time for nonviolent drug-related offenses. Rather, the State's concern was that any delay in trial would unreasonably compromise M.B.'s chance at permanency. But any delay to facilitate N.B.'s transport or alternative procedures for his full participation—such as telephonic participation for the entire hearing or a bifurcated trial with an opportunity for N.B. to review transcripts of the State's evidence—would be relatively minimal. A minimal delay would have been unlikely to seriously threaten the State's ability to quickly establish permanency for M.B., especially in light of the fact that the State itself had moved for more than four continuances, resulting in more than a four-month delay in getting to trial. The record does not suggest any special circumstances that would make an additional brief delay, to facilitate N.B.'s participation, especially harmful.

On balance, the State's interest in avoiding a relatively minimal delay did not outweigh N.B.'s fundamental interest in maintaining his relationship with M.B. and the risk of error that arose from proceeding in his absence.

*IV.    The error requires reversal*

The State argues reversal is not warranted unless N.B. can show that his full

participation at trial would have resulted in a different outcome.   *See* Suppl. Br. of

Resp't at 18-19.  We disagree.  If a petitioner shows a violation of procedural due

process based on the *Mathews* factors, the appropriate remedy is generally reversal

and remand for proceedings with constitutionally adequate procedures.  *See Fields*

*v. Dep't of Early Learning*, 193 Wn.2d 36, 52, 434 P.3d 999 (2019) (plurality

opinion) (holding that Fields' automatic disqualification from working at a

licensed child care facility violated procedural due process and remanding for an

individualized decision); *Nguyen v. Dep't of Health*, 144 Wn.2d 516, 534, 29 P.3d

689 (2001) (holding that due process required a higher quantum of proof to revoke

a medical doctor's license, vacating the Medical Quality Assurance Commission's

revocation decision, and remanding to the commission for a new decision using the

higher standard).

This approach makes sense because the *Mathews* balancing test takes into

account risk of error as the second factor, and we find a due process violation only

if we conclude there was an intolerable risk of error at the proceedings given the

private interests at stake.  When that is the case, we cannot be confident in the

result.  Indeed, other state courts have uniformly reversed, without an additional

showing of prejudice, once a parent has shown under the *Mathews* factors that their

absence from a termination trial violated due process. *See In re M.D.*, 921 N.W.2d at 238; *In re J.O.*, 43 Kan. App. 2d 754, 763, 232 P.3d 880 (2010); *In re Eileen R.*, 79 A.D.3d 1482, 1487, 912 N.Y.S.2d 350 (2010); *In re Adoption of B.J.M.*, 42 Kan. App. 2d 77, 88, 209 P.3d 200 (2009); *Ruth Anne E.*, 1999-NMCA-035, ¶ 31; *In re Baby K.*, 143 N.H. 201, 208, 722 A.2d 470 (1998); *In re C.J.*, 272 Ill. App. 3d 461, 466, 650 N.E.2d 290, 208 Ill. Dec. 833 (Ill. App. Ct. 1995); *In re S.M.*, 12 Kan. App. 2d 255, 258, 738 P.2d 883 (1987).

CONCLUSION

We reverse and remand for a new termination trial because N.B. did not receive due process of law before his parental rights were terminated. The State's interest in avoiding a relatively minimal delay did not outweigh N.B.'s fundamental interest in maintaining his legal relationship with his child and the risk of error that arose because N.B. was not afforded an opportunity to evaluate the State's evidence and consult with his attorney before presenting his defense.

González, J.

WE CONCUR:

Stephens, C.J.

Gordon McCloud, J.

Johnson, J.

Yu, J.

Madsen, J.

Montoya-Lewis, J.

Owens, J.

Whitener, J.