FILED
6/24/2024
Court of Appeals
Division I
State of Washington

IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Dependency of:<br><br>N.M.L.H. and M.I.S.,<br><br>                 Minor Children. | No. 84876-3-I (consolidated with No. 84877-1-I)<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

CHUNG, J. — C.M.'s parental rights were terminated in December 2022. She claims her right to procedural due process was violated when the court denied her motion to continue her trial held via Zoom videoconferencing[1] (Zoom) after she suffered a second trimester miscarriage the weekend before trial began. The trial court denied C.M.'s motion to continue, but provided procedural safeguards by delaying testimony for one week and limiting the first day of trial to preliminary matters and opening arguments. C.M. attended the trial, including the first day, by calling in on her phone, as was her stated preference. We hold that C.M.'s right to procedural due process was not violated by the court's denial of the motion to continue.

Amici raise additional arguments of bias and failure to provide an impartial tribunal, as well as failure to provide a meaningful opportunity to participate, based primarily on the manner of the trial court's questioning of C.M. to assess

---

[1] Zoom is a cloud-based videoconferencing software platform.

her credibility regarding the need for a trial continuance. However, while we agree that the manner and scope of questioning went beyond what was necessary, because C.M. did not raise these same claims, we cannot consider them as a basis for vacating the termination of C.M.'s parental rights.

We affirm.

## FACTS

N.M.L.H. and M.I.S., the daughters of C.M., were adjudicated dependent as to their mother in June 2021. The two girls have lived with a foster parent since 2019. The Department of Children, Youth, and Families (Department) petitioned for termination in April 2022.

C.M.'s termination trial was scheduled to begin at 10 a.m. on Monday, November 21, 2022. Because of COVID-19 restrictions, the court was using Zoom. The court noticed that C.M. was not on the Zoom conference, and her counsel responded, "Your Honor, my client is not present. I'm going to have a motion."

Counsel explained C.M. had been hospitalized over the weekend for a placental abruption,[2] had had a surgical procedure, and the baby did not survive. Counsel reported that earlier that morning, C.M. told him that "she is in a lot of pain and she is still bleeding and that the doctor recommended that she take it easy." Counsel said that C.M. had discharge papers from the hospital that she "had not had a chance to go over completely" and that counsel did not yet have

---

[2] Placental abruption is the complete or partial separation of the placenta before delivery, and is one cause of a miscarriage. Br. of Amici 6 (citing Minna Tikkanen, Placental Abruption: Epidemiology, Risk Factors and Consequences, 90(2) Acta Obstetricia et Gynecologica Scandinavica 140 (2011)).

medical records, but believed she was "right now" getting medicine from the pharmacy. Counsel asked the court for "a one to two week continuance."

In response, the Department directed the court to the dependency order, specifically, "findings number 9, 19, 20, 22, and 27," which it described as "relat[ing] to repeated delays throughout the course of [the dependency] proceeding by the mother." The Department further stated,

> I hate to suggest that I'm skeptical about what the mother is representing, but I am. And for that reason, I would certainly ask that the court not continue the trial until (1) there's a conversation with the mother where she reports to this court under oath the representation she's making, or [(2)] the court has medical documentation to substantiate the basis for the continuance. And that's really based on the Department's history with the mother, and specifically, our history during [dependency] trial proceedings in 2021, which were delayed for months over a variety of issues.
> I know the court's read that order. There are repeat findings that the mother is not credible, and so, unfortunately, the Department cannot take her at face value, and neither should the court.

The court asked the Department if it could seek "up-to-date information" from its social worker, and the Department assented. Upon questioning by the court, the social worker testified under oath that she had not had any contact with the mother in the last week[3] and relied on the mother's lawyer to provide the mother with information about the trial. However, the social worker confirmed that the Department had reached out, through its counsel, to the mother to assist her in participating in the trial by offering a ride to the courthouse and reminding her that she still had a Department tablet computer she could use to participate remotely.

---

[3] The social worker also confirmed that the mother had threatened her with seeking an anti-harassment order if the social worker continued to contact her.

Counsel for the court-appointed special advocate (CASA) concurred with the Department that given the history of delays in the past, if nothing else, the mother should be able to appear long enough "to verify her situation" and provide a time when the documents would be ready to provide to the court.

After C.M.'s counsel agreed that the court could review the dependency order for purposes of deciding the motion for continuance, the court read into the record the portions of the order that it was considering. These findings included the following:

> 19. The court finds that the mother persistently—either through a lack of preparation or intentionally—caused hours of delay in trial. The Department and the court made extraordinary efforts to address any and all technology issues by providing the mother with a hotel room, the tablet, and personal assistance. Mother insisted on staying at a particular hotel . . . . The Department honored this request. Mother at one point insisted that the trial recess prior to the lunch hour so she could go get McDonald's. Mother created additional delay by getting kicked out of her hotel room by smoking in the room. Mother lied to the court when, at one point, hotel staff came to the mother's room during the trial to address complaints about her smoking. Mother told the court that it was merely housekeeping . . . . In fact, hotel staff were informing mother that she would need to leave the hotel due to her smoking. The Department called the hotel manager . . . [who] credibly testified that the mother was caught smoking in her hotel room and was told she could not remain in the hotel beyond the current checkout date . . . [and] that the Department would have to pay $250 to clean the hotel room. . . .

> 20. The Department sent social worker Jennie Webb to the hotel—nearly 1.5 hours round trip—to assist [C.M.] in getting the tablet to work and to ensure there were no technical problems with the tablet. This again created more delay as mother refused to meet Ms. Webb in her hotel room, the lobby, and then refused to allow Ms. Webb to see or handle the tablet at all [because] [t]he mother had recently been hospitalized for COVID-19 . . . . Ms. Webb was masked and wearing latex gloves at the time.

> 21. The Department made extensive efforts to facilitate the mother's participation in trial. These included months of phone

> plans, purchasing of several [nights] in the hotel for participation in trial, provision of a tablet so mother could join trial by video, and sending the social worker supervisor to the hotel to assist mother directly with the table[t] provided for trial.
>
> 22. Mother consistently obstructed these [efforts], alleging problems or barriers to her participation, and ultimately lied to the court about the issues preventing her participation in trial. Taken as a whole, the mother's testimony lacked credibility.

After reading these findings from the dependency order into the record, the court concluded, "From those findings, the court does look with skepticism upon the report to the court."

Counsel for C.M. acknowledged the court's prior findings "were justified in frustration, [for] the delays," but that the only other time the mother requested a continuance during the dependency proceedings was for when she was hospitalized with COVID-19. C.M.'s counsel stated that at the time, there "was a lot of skepticism," but he noted the mother had provided a positive COVID-19 test and a hospital arm band as evidence; according to counsel, the court found this evidence persuasive and continued the proceeding. In response, the Department noted that the court had taken counsel's representation that the mother was hospitalized for COVID-19 without further documentation and requested that the court now require medical records and that they be "scrutinized for authenticity."

After further discussion, the parties agreed to recess so C.M.'s counsel could obtain "whatever medical records she has," such as discharge papers, as well as a release of information for the hospital to provide records to the Department, limited to those showing "why she's representing she can't be in court." The court reconvened when C.M. was able to call in to the proceeding on

5

Zoom, at which point it was 11:25 a.m. The court told C.M. she was in open court at her termination trial. The court also informed C.M. that her attorney had asked for a continuance and the court would like for her to testify so the court could "get some information from [her] about what's been going on." C.M. agreed to testify, and the court swore her in.

The court began by posing its own questions to C.M. C.M. testified that she "started bleeding a whole lot and having very, very bad pain, so I called the ambulance" on Saturday and went to Saint Francis hospital. She stated she was in the hospital for a day or a day-and-a-half, she had discharge papers, and she had sent photos of the paperwork to her attorney. C.M. testified that the discharge papers told her to be on "bed rest" and recommended she "stay out of work for a week." The court asked how long she was supposed to be on bed rest, and C.M. answered "two weeks." C.M. testified she had been prescribed Tylenol as pain medication, though it was not helping. She confirmed that she sent the discharge notes to her attorney and discussed signing a release of hospital records from the last weekend, but had not been able to sign it.

The court then allowed the Department to question C.M. The Department inquired about the discharge paperwork; C.M. confirmed the papers stated she should return to work in two weeks. Asked about when she was able to communicate with her attorney, C.M. testified she had been discharged the evening prior but had not contacted her attorney until that morning.

Counsel for the CASA then examined C.M. Counsel asked why C.M. did not go to the emergency facility next door to the hotel where she was staying,

and she responded that it did not have an emergency room. C.M. testified that in addition to Tylenol, she received other medications at the hospital and, going forward, antibiotics as well. The CASA attorney also asked about the duration and conditions of bed rest, and C.M. said she was supposed to be on 100 percent bed rest for two weeks. Asked where the social worker could find her if she needed to contact her in person in the next two weeks, C.M. said on that day, she would still be at the motel but was "not willing to say" which room number. The court then asked why she was not willing, and if the social worker came to bring her a document, how she would meet with C.M. Eventually, C.M. provided her room number.

The court then asked C.M., "Were you planning to come to trial today before this happened?" She answered, "Via Zoom, yes, ma'am." Her counsel asked C.M. if she could testify. She answered she did not think she could that day because "I don't think that I'll be able to put my attention into the trial with the pain."

Her counsel then asked, "[D]o you think that in, you know, in approximately a week you would be ready to testify"? C.M. answered, "Yes." Counsel reiterated, "In a week?" C.M. answered: "Yes."

The court asked C.M. if she learned from the hospital what had happened. She answered that she "was diagnosed with . . . a placenta abruption." The court asked, "[H]ow far along?" C.M. answered, "17 weeks." The court asked if she was still pregnant or if the pregnancy was lost. C.M. answered that she had "lost the pregnancy." The court said it was "sorry for [her] loss." After additional

questioning by the Department and C.M.'s counsel, the court thanked C.M. for providing testimony and asked her to stay on the call while court was in session that day.

The court then heard further argument from the parties regarding the motion for continuance. C.M.'s counsel renewed her motion "to proceed next Monday. So I would ask that the court recess until Monday." The Department stated that while the mother's testimony was "very sad if it is true," it did not relieve the need for medical documentation. Both the Department and the CASA opposed the court granting a continuance without "credible evidence to continue trial."

The court gave the parties instructions for its lunch hour recess. First, it wanted the discharge paperwork in its possession. Second, the court instructed the parties to check their calendars through the next week and the following Monday for the possibility of "an expanded trial day of 8:00 to noon and 1:00 to 4:30 to try to get this case tried."

The court then asked C.M. if she had the computer that the Department gave her or another computer she could use instead of using the phone to connect to trial. C.M. answered, "I'll be using this phone." The court said, "Okay. So you'd rather just use the phone rather than something with video?" C.M. answered she could use the phone's video. The court said, "I will assume that you are able to connect to the Zoom every time we start trial again. And so if you're not here, I will go ahead without you. Do you understand that?" C.M. answered, "That's fine."

After a recess, the court described the documentation it had received related to the motion for continuance: photographs of a document titled "After Visit Summary" with the mother's name. The document indicated there were 13 pages, but according to the court, C.M. had photographed and sent only three pages.[4]

The court then proceeded to make findings "pursuant to Mathews v. Eldridge."[5] The court found the mother "has a significant private interest in the care and custody of her children and of maintaining her parental rights." It found that "[t]he State has similar interests [to the children] in the children's welfare and has an interest in quickly resolving parental termination cases, again, to keep the children in its custody from legal limbo."

As to "the risk of an erroneous deprivation," the court found the mother "always intended to attend trial by remote means and had no intent to attend trial in person." The court stated: "She always intended to attend trial by phoning in with her phone as she's done today, stating that was her preferred way to attend trial."

The court continued, "I do find that the mother experienced a medical event that led to the termination or miscarriage of her pregnancy. She was

---

[4] The court marked the documents it received but did not admit them into the record. As these documents were referenced in the Department's briefing, we directed the Department to supplement the appellate record. In response, the Department supplemented the record with Exhibits 301 and 302, which are photographs of pages of C.M.'s medical records that the court reviewed, along with a motion to seal.

The official juvenile court file, not related to the commission of juvenile offenses, such as dependency and termination proceedings, is "presumptively sealed" under RCW 13.50.100. In re the Welfare of O.C., 27 Wn. App. 2d 671, 682, 533 P.3d 159 (2023). Pursuant to GR 15(c)(2)(A) and RCW 13.50.100, we grant the Department's motion to seal the exhibits.

[5] 424 U.S. 319, 332, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976).

released from the hospital yesterday. Her discharge summary states that it was printed at 11:51 a.m., and I find that she was released at or about that time."[6] The court found that "the only medication she's been prescribed is Tylenol and an antibiotic" and "she was coherent testifying today and by her tone and manner of testifying suggested that while she might be tired, she's not experiencing any difficulty tracking information or participating."

The court stated, "The Department is not calling the mother to testify. That means the earliest she will need to testify is sometime next week or the following week." It noted that her "attorney agreed that she will be able to testify by a week from today, next Monday," and "[t]he mother is represented by a capable and engaged attorney who has and continues to zealously and effectively represent her." The court further found that the mother will "be able to hear all testimony, to talk to her attorney at any time about the testimony, and to testify once she's feeling stronger if she chooses to testify." Finally, the court found that "[h]er medical condition has not changed how [the mother's attendance at trial] will be handled. She always intended to appear by remote means and by audio only."

The court concluded, "Therefore, I find no risk of erroneous deprivation by denying a continuance and allowing the trial to proceed." However, "in an abundance of caution," the court decided "it may serve us well to handle all . . . preliminary matters today, and to recess until Monday." The court asked the parties if there was "anything you'd like me to address before [it did] things and the way [it was] planning to do them." The parties answered, "no." The court then

---

[6] As to the time of release, the court also stated, "Without substantiation, I do not credit the mother's testimony that she was released when it was dark outside yesterday."

proceeded with preliminary matters. It denied the Department's ER 904 motion to admit all its evidence "en masse." The parties gave short opening statements, and then the court addressed the mother:

> So I know, [C.M.], you're here. I wish you a speedy recovery. I imagine that what you just went through was really traumatic and sad and hard. I want you to know that I have empathy for you and I do hope that the next week will bring you some peace and also some rest.
> We'll be starting back up at 8:00 a.m. a week from today, Monday. And we'll start right on time. So if you can again dial in either using this phone, or if you want to use the tablet instead, that would be fine too. But we won't wait because we do need to get this case resolved.
> With that, we will be in recess until November 28th, Monday, at 8:00 am. We're in recess.

Trial resumed on Monday, November 28, at 8 a.m. When the court realized C.M. was not present, her counsel explained that was his fault, and the court delayed the start of trial until 8:24 a.m. C.M. joined a short while later during the first witness's testimony.

Trial continued the next day, Tuesday, November 29. The court gave C.M. and her counsel time to speak privately to discuss whether C.M. would testify. C.M. decided to testify, and the court set her testimony to begin at 11:00 a.m. When the court reconvened at 11:01 a.m., C.M. was not present. C.M.'s counsel told the court that C.M. had asked for a few minutes at the end of their preparation during the recess. The court allowed a recess until 11:15 a.m. At 11:15 a.m., C.M. still had not joined via Zoom. The court went into a "stand by" recess, where the court had its Zoom camera on to monitor when C.M. joined, at which point trial would resume. C.M. joined Zoom via telephone at 11:17 a.m. and testified.

Trial concluded on Wednesday, November 30. C.M. called in during the Department's closing argument. The court terminated C.M.'s parental rights as to both her daughters. The court's written findings accompanying its termination order stated that "the court has not relied on [C.M.'s] testimony" because her "testimony was unreliable at her dependency trial and was in this trial at times internally inconsistent and inconsistent with other credible evidence." C.M. timely appeals.

DISCUSSION

I.      Procedural Due Process

C.M. claims the court violated her constitutional right to procedural due process by not granting her motion to continue. She argues her fundamental right to parent, "coupled with the risk of an erroneous deprivation of this right by forcing Ms. M to proceed with trial despite her medical condition," outweighed the Department's interest in avoiding a brief delay.

Procedural due process requires the government to meet certain constitutional minimum standards before it may lawfully make decisions that affect an individual's liberty interests. In re the Welfare of M.B., 195 Wn.2d 859, 867, 467 P.3d 969 (2020) (citing Mathews, 424 U.S. at 332). Parents have a fundamental liberty interest in the care and custody of their children, and so when the State seeks to terminate parental rights, " 'it must provide the parents with fundamentally fair procedures.' " Id. (quoting Santosky v. Kramer, 455 U.S. 745, 753-54, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982) (plurality opinion)).[7]

---

[7] The Department suggests that the mother "effectively waived the issue" by not raising below any other difficulties and by failing to argue here a manifest error affecting a constitutional

Due process protections include a strict burden of proof, the right to notice and an opportunity to be heard and to defend, and the right to the assistance of counsel. Id. In a parental rights termination trial, to determine whether alternative procedures satisfy due process, we use the balancing test set forth in Mathews. Id. at 868 (citing Santosky, 455 U.S. at 754). Under this test, the court balances (1) the private interests affected, (2) the risk of error created by the procedures used and the probable value of any additional procedural safeguards, and (3) the State's interest in using the challenged procedure. Id. (citing Mathews, 424 U.S. at 335). We review alleged violations of due process de novo. Id. at 867.

For example, in In re the Welfare of L.R., the mother of two dependent children was incarcerated but wanted to attend her termination trial in person. 180 Wn. App. 717, 720, 324 P.3d 737 (2014). While the Department did not contest the mother's motion for a two-week continuance to arrange for transportation, the court denied the motion because "there was no guarantee that [the mother]'s transport request could be arranged in a timely manner or even accommodated at all." Id. at 721. The mother then attempted to attend trial by phone. Id. When her counsel could not reach the mother's corrections officer so she could call in, the court denied mother's counsel's objection to proceeding with trial. Id. The court proceeded with trial that day and heard testimony from the

---

right under RAP 2.5(a)(3). But "[i]t is consistent with RAP 2.5(a) for a party to raise the issue of denial of procedural due process in a civil case at the appellate level for the first time." Conner v. Universal Utils., 105 Wn.2d 168, 171, 712 P.2d 849 (1986); cf. In re the Det. of M.S., 18 Wn. App. 2d 651, 656-57, 492 P.3d 882 (2021) (declining review under RAP 2.5(a)(3) where the appellant "fail[ed] to undertake the Mathews balancing test at all"). As a termination trial involves fundamental liberty interests, C.M. has alleged an error of constitutional magnitude and has undertaken the Mathews balancing test to establish manifest error.

Department's social worker. Id. at 722. The mother was able to call in for the last two days of trial. Id. The court terminated the mother's parental rights. Id.

We held in L.R. that the mother's due process rights were not violated because, while the mother "had a strong interest in attending, . . . she missed only one day of a three-day hearing," and the Department "had a compelling interest in not delaying the proceedings any further." Id. at 727. We allowed that "the better practice may have been to continue the trial to allow the parent to attend telephonically"; nevertheless, because the mother was represented and cross-examined the case worker who testified when the mother was not present, the mother attended trial over the phone the remaining two days, and the court allowed the mother to recall the case worker, the court had employed "sufficient procedural safeguards" to ensure the mother's procedural due process rights were not violated. Id. at 726, 728.

In M.B., M.B.'s father, N.B., learned he was a father while he was incarcerated. 195 Wn.2d at 863. The father expressed his "strong desire to be present" for his termination trial, which was continued four times from April to September 2018. Id. at 864. When the father was unable to arrange for transport, the court continued the trial to the next week and signed a transport order. Id. at 865. Nonetheless, the Department of Corrections (DOC) did not transport the father for the first day of trial. Id. The father did not object to the court's plan to begin trial but to wait to take testimony from the principal witnesses until he was present. Id. The next week, DOC again failed to transport the father. Id. The court decided to take the father's testimony over the phone, and that same day, the

court heard testimony from the Department's social worker, corrections officers, and a psychologist who had examined the father. Id. The father's counsel cross-examined each witness. Id. at 866. The father was able to phone in and testify on the trial's final day. Id. At the direction of the court, the father hung up after testifying and did not have an opportunity to consult with his counsel. Id. When the court reconvened for closing argument in the afternoon, the father was not on the phone. Id. The court terminated the father's rights, and this court affirmed. Id.

Our Supreme Court reversed and remanded for a new trial, reasoning, "On balance, the State's interest in avoiding a relatively minimal delay did not outweigh N.B.'s fundamental interest in maintaining his relationship with M.B. and the risk of error that arose from proceeding in his absence." Id. at 876, 878. While an incarcerated parent does not have an absolute right to appear in person, such a parent "must be given a meaningful opportunity to be heard and defend though alternative procedures." Id. at 868. The court distinguished L.R., in which "the mother was represented by counsel to defend her when she was not present, was able to privately consult with counsel between witnesses when she was, and was able to recall the single witness she missed," whereas the father in M.B. "missed essentially the entire presentation of the State's evidence and was afforded no alternative means to review that evidence and contribute to his defense." Id. at 875.

We thus examine the Mathews factors and the facts in this case. To determine whether C.M. was deprived of procedural due process, we balance the mother's interest, the risk of an erroneous deprivation through the procedures

used and any procedural safeguards, and the State's interest in the procedures used and any burden additional safeguards would have imposed.

### A. The Mother's Interest

The first Mathews factor is the "nature and weight of the private interests affected by the challenged government action." M.B., 195 Wn.2d at 868 (citing Matthews, 424 U.S. at 335). C.M. argues her interest in parenting her children is "fundamental," and the Department does not argue to the contrary. We agree.

The private interest here, the right to parent, " 'is perhaps the oldest of the fundamental liberty interests recognized by [the United States Supreme] Court.' " M.B., 195 Wn.2d at 868 (quoting Troxel v. Granville, 530 U.S. 57, 65, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000) (plurality opinion)). This interest " 'does not evaporate simply because [a parent has] . . . lost temporary custody of their child to the State.' " Id. (quoting Santosky, 455 U.S. at 753). Termination severs that fundamental liberty. Id. Here, "[b]ecause of the tremendous stakes, '[a] parent's interest in the accuracy and justice of the decision' is 'commanding.' " Id. (quoting Santosky, 455 U.S. at 759 (quoting Lassiter v. Dep't of Soc. Servs., 452 U.S. 18, 27, 101 S. Ct. 2153, 68 L. Ed. 2d 640 (1981))). Moreover, "[u]ntil the State proves parental unfitness, a child *shares* their parent's interest in an accurate and just decision. M.B., 195 Wn.2d at 869. Together, "[t]hese private interests are enormous and weigh in favor of any reasonable error-reducing procedure." Id.

### B. The Risk of an Erroneous Deprivation

Next, we evaluate the risk of erroneous deprivation of the interest at stake through the procedures used and the probable value, if any, of additional

safeguards. <u>M.B.</u>, 195 Wn.2d at 869. The mother argues the additional safeguard she requested, a continuance "of up to two weeks," "would have eliminated" the risk of an erroneous deprivation.

Contrary to the State's assertion that the mother's motion to continue was not denied, the court unambiguously denied the mother's motion.[8] It stated it found "no risk of erroneous deprivation by denying a continuance and allowing the trial to proceed."

C.M. initially requested a one- to two-week continuance. She testified that her doctors told her to rest in bed for two weeks. Nonetheless, when asked by her counsel, "[e]ven though you may be on bed rest, do you think that . . . in approximately a week you would be ready to testify," C.M. answered, "Yes." When she renewed her motion, it was "to proceed next Monday. So I would ask that the court recess until Monday."

The court denied the motion, but it arranged, "in an abundance of caution," to recess her trial for a week, "until Monday," after hearing preliminary matters that day. Before proceeding that day, the court ensured C.M. would be present on the phone as she preferred, that she could confer with counsel, and that she would not be required to testify that day. The court asked if any party objected to proceeding "the way [it was] planning to do." C.M. did not object.

Here, the one-week continuance C.M. requested, "until Monday," would have provided some additional safeguard because it would have allowed her to

---

[8] The Department argues in the alternative that the court did not abuse its discretion by denying her motion, because the mother "obtained the bulk of the process she wanted, a one-week continuance." But the abuse of discretion standard does not apply to C.M.'s procedural due process claim.

rest and further recover from the placental abruption she suffered. But when directly asked by the court if she objected to the court's plan to proceed that day with preliminary matters, with her attending by phone, C.M. did not object. And the court ensured C.M.'s testimony was not required that first day, Monday, November 21. It also ensured C.M. knew how to confer with her counsel. Unlike the mother in L.R. or the father in M.B., in the present case, C.M. was present via phone each day for her termination trial. Unlike the court in M.B., the court in the present case took care to ensure the mother knew how to confer with her counsel while appearing by phone. We thus conclude that the probable value of the additional safeguard the mother wanted, a complete continuance and cessation of trial proceedings "to [the] next Monday," was low.

C.M. argues she was in "no condition to participate effectively in the rigors of a trial" after she experienced "a major medical event," and the court "created a risk of an erroneous deprivation of her parental rights" by "[f]orcing her to proceed with trial." She argues the risk "is borne out by the record" because she "appeared for trial telephonically" and periodically "disengaged" from the proceedings. She cites M.B. for the proposition that in-person, "nuanced communication" is particularly important in a termination trial because the Department is "already advantaged" and the "outcome largely turns on subjective standards." 195 Wn.2d at 871.

But C.M. never intended to appear at her termination trial in person. It was her plan, from before her hospitalization, to appear "via Zoom." The court asked C.M. exactly this question: "Before this happened, were you planning on

18

attending your trial either in person or via Zoom?" C.M. answered: "Via Zoom, yes, ma'am." And C.M. kept to her plan after trial resumed the next Monday, November 28. The following day, November 29, C.M. testified by phone over Zoom. Here, C.M. is not like either the mother in L.R. or the father in M.B. who wanted to appear in person. Unlike the mother in L.R., who called in for two of the three days of her trial, C.M. called in each day for her termination trial, as was her preference. And unlike the father in M.B., C.M. used Zoom breakout rooms to confer privately with her counsel during her trial. A parent's failure to in fact engage—i.e., if the parent has the means to engage but does not exercise them—does not establish procedural error.[9] Thus, we conclude that the procedure used, C.M. calling in by phone, did not increase the risk of an erroneous deprivation compared to the procedure desired, a continuance, after which C.M. would still have participated by phone because that was her stated preference.

### C. The Department's Interest

Finally, we must consider the Department's interest in the procedures used and the burdens that additional safeguards would entail. M.B., 195 Wn.2d at 875. C.M. argues that the "minimal delay" she requested and the fact that her daughters were already in "the same pre-adoptive home" where they had been

---

[9] Amici argue that the court increased the likelihood C.M. would disengage and thus denied her a meaningful opportunity to participate. They argue that only if C.M.'s motion for a continuance had been granted would she not assume that "her further participation was futile." But the record does not show C.M. disengaged, and whether she would have been more engaged had her request been granted is a matter of speculation.

for the last two years indicate that it is "unclear" how the additional safeguard she wanted would have been "especially harmful" to the Department.

The State has an important interest in the welfare of a child in its custody. M.B., 195 Wn.2d at 875. An unwarranted delay in finality could potentially damage a child's chance for permanency and stability. See RCW 13.34.020 (declaring a child's interest in a speedy resolution of dependency and termination proceedings). Children kept in " 'legal limbo' " suffer much " 'mental and emotional strain.' " M.B., 195 Wn.2d at 875 (quoting In re the Dependency of M.H.P., 184 Wn.2d 741, 762, 364 P.3d 94 (2015)). "When the rights of basic nurture, physical and mental health, and safety of the child and the legal rights of the parents are in conflict, the rights and safety of the child should prevail." RCW 13.34.020. Here, we conclude the Department had an important interest in furthering N.M.L.H.'s and M.I.S.'s permanency by proceeding with the termination trial.

### D.  Balancing the *Mathews* Factors

C.M.'s interest in parenting her daughters is fundamental, yet still subject to balancing under Mathews. The risk that the court's decision to deny C.M.'s motion for a one-week continuance erroneously deprived her of her right to parent her daughters is low because she was present on the phone, per her preference, while her counsel argued preliminary matters and during short opening statements for two hours total on the first day of trial. The continuance C.M. requested until the following Monday would provide little additional

procedural safeguard because the court already rearranged its schedule to recess her trial until that time.

Further, though an additional week's delay would have been a minimal burden, the Department had an important interest in the permanency of C.M.'s daughters' placement. We therefore conclude C.M.'s due process rights were not violated when the trial court denied her motion to continue, addressed preliminary matters and heard only opening statements on the first day, then recessed her trial until the next Monday as an additional safeguard, and the mother continued to attend trial remotely by phone, as was her preference.

II.     Bias and Due Process Right to Fair Tribunal

C.M. and amici curiae[10] make additional arguments based on racial bias. Citing Henderson v. Thompson, 200 Wn.2d 417, 437, 518 P.3d 1011 (2022), cert. denied, 143 S. Ct. 2412, 216 L. Ed. 2d 1276 (2023), C.M. argues that because she is a Black woman, the court subjected her to "extensive and invasive questioning" that "played on dangerous tropes that Black people, and Black women in particular, are less susceptible to pain and tend to exaggerate their symptoms."[11] She argues that the court "seriously erred in concluding [C.M.]

---

[10] Amici are Dorothy Roberts; Legal Voice; Birthing Cultural Rigor, LLC; Cynthia Soohoo; Ancient Song; Reframe Health & Justice; If/When/How: Lawyering for Reproductive Justice; Crumiller, P.C.; Elephant Circle; Mishka Terplan; Bobbie Butts; Kristyn Brandi; Pregnancy Justice; Ivana Thompson; Movement for Family Power; Atlanta Doulas Collective; Pegasus Health Justice Center; The Sayra & Neil Meyerhoff Center for Families, Children and the Courts; The Shades of Blue Project; Shafia Monroe Consulting/Birthing Change; Southern Birth Justice Network; The Foundation for Black Women's Wellness; The Academy of Perinatal Harm Reduction; The Beyond Do No Harm Network; Civil Rights Corps; King County Department of Public Defense; and Washington Defender Association.

[11] The Department asserts the mother's bias claim "lacks merit" as the court could not have determined she was Black because "she called the court on her phone and was not visible." Our Supreme Court has stated that families of color are disproportionately impacted by child welfare proceedings, so "actors in child welfare proceedings must be vigilant in preventing bias from interfering in their decision-making." In re the Dependency of K.W., 199 Wn.2d 131, 156,

could adequately participate in the termination proceeding despite her medical condition."

Henderson held that "upon a motion for a new civil trial, courts must ascertain whether an objective observer who is aware that implicit, institutional, and unconscious biases . . . have influenced jury verdicts in Washington State could view race as a factor in the verdict." 200 Wn.2d at 435 (citing State v. Berhe, 193 Wn.2d 647, 665, 444 P.3d 1172 (2019)). If a civil litigant makes "a prima facie showing sufficient to draw an inference of racial bias under this standard," the court must grant an evidentiary hearing, at which it must presume that racial bias affected the verdict, and if the party benefiting from the alleged racial bias cannot prove that racial bias had "no effect on the verdict," then the verdict is incompatible with substantial justice, and the court should "order a new trial under CR 59(a)(9)." Id.

To the extent C.M. is raising a claim like the one in Henderson—a claim based on the due process right to a fair tribunal—and not only a procedural due process claim, we decline to consider the argument because she did not raise the issue below. See RAP 2.5(a) ("appellate court may refuse to review any claim of error which was not raised in the trial court"). Moreover, C.M. neither sought a new trial nor assigned error on appeal on this basis.

---

504 P.3d 207 (2022). The dependency order does not expressly state C.M.'s race, and the court document cited by C.M. that indicated her daughter N.M.L.H.'s race as Black/African American was generated *after* her trial. Nevertheless, racial bias can exist without certainty of another's race, and bias may be unconscious as well as conscious. See Letter from Wash. State Sup. Ct. to Members of Judiciary & Legal Cmty. 1 (June 4, 2020), https://www.courts.wa.gov/content/publicUpload/Supreme%20Court%20News/Judiciary%20Legal%20Community%20SIGNED%20060420.pdf [https:// perma.cc/QNT4-H5P7] (discussing unconscious bias).

Amici make additional arguments relating to bias. They argue that the court revealed its underlying racial bias, it failed to preserve an appearance of impartiality, and the judge's conduct was not impartial. Thus, amici contend, the court denied the mother an impartial tribunal and denied her a meaningful opportunity to participate in her trial.

" 'A fair trial in a fair tribunal is a basic requirement of due process.' " In re the Dependency of A.E.T.H., 9 Wn. App. 2d 502, 517, 446 P.3d 667 (2019) (quoting Peters v. Kiff, 407 U.S. 493, 501, 92 S. Ct. 2163, 33 L. Ed. 2d 83 (1972) (quoting In re Murchison, 349 U.S. 133, 136, 75 S. Ct. 623, 99 L. Ed. 942 (1955))). Due process " 'requires more than an impartial judge; it requires that the judge also *appear to be* impartial.' " Id. (quoting State v. Solis-Diaz, 187 Wn.2d 535, 540, 387 P.3d 703 (2017)) (emphasis added). In other words, even if there is no showing of actual bias, " 'due process is denied by circumstances that create the likelihood or the appearance of bias.' " Id. (quoting Peters, 407 U.S. at 502). Therefore, " '[t]he party asserting a violation of the appearance of fairness must show a judge's actual or potential bias.' " Id. (quoting Solis-Diaz, 187 Wn.2d at 540). There is a presumption that a trial judge properly discharges official duties without bias. State v. Mandefero, 14 Wn. App. 2d 825, 835, 473 P.3d 1239 (2020) (citing In re the Pers. Restraint of Davis, 152 Wn.2d 647, 692, 101 P.3d 1 (2004).

Amici claim that the court's "manner" of questioning the mother prejudged her credibility. They argue C.M. was entitled to have her credibility determined at trial under RCW 13.34.090, but the judge's questioning "characterize[ed] [C.M.]

23

as an untrustworthy and defiant Black woman, as uncaring and unfeeling, and therefore not credible." To the extent amici challenge the court's ultimate finding on credibility in its termination order,[12] the mother's appeal did not assign error to any specific finding of fact. Moreover, it is not the role of an appellate court to review credibility findings. Greene v. Greene, 97 Wn. App. 708, 714, 986 P.2d 144 (1999) ("We will not . . . adjudge witness credibility.").

As for questioning C.M., the court made a record of relevant evidence, weighed the evidence, and made credibility determinations for the purpose of deciding C.M.'s motion to continue.[13] In the context of this litigation, the court's examination of the mother's stated reason for the motion to continue was prompted by the prior findings in the related dependency proceeding regarding the mother's obstruction of efforts to facilitate her participation, her repeated claims of new problems or barriers to her participation, and the court's prior finding that she had "ultimately lied to the Court about the issues preventing her participation in trial." Proceedings in dependency and termination matters are "inherently interrelated," so the dependency order findings the court read into the record, with the mother's agreement, were relevant to her motion to continue the

---

[12] The court's written order terminating the mother's parental rights states, "Because [C.M.'s] testimony was unreliable at her dependency trial and was in this trial at times internally inconsistent and inconsistent with other credible evidence, the court has not relied on [C.M.'s] testimony in making these findings."

[13] Amici also challenge the court's statement that it did "not credit the mother's testimony that she was released when it was dark outside yesterday." But the court made that comment specifically in considering the mother's pretrial motion for a continuance, and explained that this finding as to when C.M. was released from the hospital was based on the photo of her discharge summary, which showed it was printed at 11:51 a.m., not "when it was dark," i.e., in the evening, as C.M. had testified. And ultimately, on the key factual issue relating to the motion to continue—whether C.M. had been hospitalized the weekend before the trial was set to begin, as she claimed—the court explicitly found, "I do find that the mother experienced a medical event that led to the termination or miscarriage of her pregnancy."

trial. See In re the Dependency of A.N.G., 12 Wn. App. 2d 789, 795, 459 P.3d 1099 (2020).

Nonetheless, even if, based on C.M.'s prior behavior, it was appropriate for the court to seek verification of her stated reason for a continuance—i.e., whether she had in fact been hospitalized for a placental abruption—there were far less intrusive ways for the court to do so. For instance, the court could have relied on C.M.'s counsel's representations based on his conversations and his review of C.M.'s discharge papers, as attorneys are officers of the court who owe a duty of candor to the court. Or, the court could have simply reviewed the discharge papers to learn, as it did, that C.M. had been hospitalized, the name of the hospital, the date of discharge, and the discharge instructions, including medications and care recommendations. The court also could have satisfied itself as to C.M.'s ability to participate with fewer questions and could have limited questioning of her by the Department and the CASA.

Instead, the court allowed C.M. to be subjected to two rounds of detailed questioning that required her to share personal and sensitive health information with multiple people present, fewer than 48 hours after she was hospitalized and suffered a pregnancy loss. After the court questioned C.M. about information relevant to the need for a continuance, similar to what the discharge papers themselves contained, it allowed all the attorneys to further interrogate her. The Department's attorney asked C.M. if she knew she was pregnant before she went to the hospital, when she could return to work, and nine separate questions regarding when she communicated with her attorney. The CASA attorney asked

C.M. why she chose to go to the particular hospital rather than a different facility and asked her again about the recommended period of bed rest. C.M.'s counsel asked her questions about her ability to participate in the trial and their communications about her hospitalization. And then the court allowed another round of questioning, starting with its own additional questions. The court asked for details about her condition and diagnosis, how far along she was in her pregnancy, and, "Are you still pregnant or did you lose the pregnancy?" And following that, the Department and C.M.'s counsel each asked yet more questions. The volume of questioning, the topics, and the redundancy all were well beyond what was necessary for the court to determine whether there was a valid basis for a continuance and what additional procedural safeguards were necessary. It can be no surprise such interrogation would cause a parent facing termination of her rights to her children, on the heels of a pregnancy loss, while still recovering from hospitalization, to feel assailed, powerless, and without agency in the legal process.

But as painful to C.M. and as insensitive as the manner of questioning may have been, she did not raise the claims that amici raise, either to this court or below. C.M. does not argue a due process violation based on actual bias or appearance of bias in the tribunal, or that the manner of questioning prejudged her credibility or otherwise deprived her of a meaningful opportunity to engage or participate. Nor does she assign error on those bases on appeal. The sole assignment of error in her opening brief states that "[t]he court violated Ms. M's constitutional right to *procedural* due process when it denied a continuance."

Brief of Appellant at 2 (emphasis added). The sole "[i]ssue pertaining to assignments of error" she raised is whether the court's denial of her motion to continue risked the erroneous deprivation of her parental rights. On review, an appellate court "address[es] only claims made by a petitioner, and not those made solely by amici." Cummins v. Lewis County, 156 Wn.2d 844, 850 n.4, 133 P.3d 458 (2006). Consequently, we are not able to consider the arguments made solely by amici here.

                              CONCLUSION

        C.M. challenged the trial court's termination of her parental rights as to her daughters, N.M.L.H. and M.I.S., solely based on procedural due process grounds. The court's decision to proceed with the trial, but to delay testimony for a week, provided C.M. with adequate procedural safeguards. Even before her emergency hospitalization, C.M.'s preference was to attend her trial by calling into the trial via Zoom, and that is what she did. We hold that C.M.'s right to procedural due process was not violated, and, therefore, we affirm.

_____
Chung, J.

WE CONCUR:

_____          _____
Díaz, J.                                  Coburn, J.