IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| In the Matter of the Parental Rights to<br><br>A.K.-J.S. | No. 86721-1-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

HAZELRIGG, C.J. — In this appeal from the order terminating her parent-child relationship with A.K.-J.S., D.S. avers that the trial court erred when it granted her request to represent herself, allowed the State to examine several witnesses in her absence which she alleges violated her due process rights, and failed to make findings regarding A's sibling relationships pursuant to RCW 13.34.200(3) and RCW 13.34.190(1)(b).  As none of these alleged errors merit reversal, we affirm the termination order.

FACTS

A is the child of D.S. (mother) and J.M. (father) and was born on September 29, 2020.  D.S. "admitted that [A] was exposed to methamphetamine and cocaine in utero."  The Department of Children, Youth, and Families (DCYF) removed A from D.S.'s care pursuant to the finding of dependency in May 2021.  The trial court had previously entered an agreed order of dependency and dispositional orders in as to D.S.  The court's dependency and dispositional orders relating to J.M. followed in November 2021 and February 2022, respectively.

DCYF brought a petition for termination of the parent-child relationship of both parents in May 2023. DCYF alleged that both parents had numerous parental deficiencies, it had offered or provided a variety of services to correct these deficiencies, and D.S. had "struggled to stay engaged and/or complete her court ordered services" over the course of several years.[1] More specifically, DCYF alleged the following deficiencies in its amended petition for termination as to D.S.: "untreated substance use disorder issues; untreated mental health issues; and issues relating to domestic violence with the father and associated risk of exposure to domestic violence" which impaired D.S's "ability to safely parent." J.M. consented to the termination of his parental rights in September 2023.

The parties appeared for trial in King County Superior Court on February 27, 2024.[2] A had remained out of her parents' custody for over three years by the time of the termination trial. D.S. informed the court in her trial brief that she was "presently awaiting an inpatient bed date" and, in the event a date was secured during trial, she would move to continue her case until she completed treatment. D.S. was not present when the proceeding began; her attorney informed the court that D.S. was still in transit. The court handled a few preliminary matters before taking a fifteen-minute recess. D.S. was present when court reconvened. D.S.'s

---

[1] DCYF further alleged that J.M. had completed "a Domestic Violence assessment in February 2022" but had "not engaged" in other "recommended services or completed a parenting assessment."

[2] DCYF filed a motion that same day which stated, "Although both parents reported that they did not have any Native ancestry, a maternal third cousin subsequently reported that the child has Native Ancestry through an unspecified tribe" and the Bureau of Indian Affairs (BIA) had been notified in compliance with the Indian Child Welfare Act (ICWA), 25 U.S.C. §§ 1901-1963, and with the Washington Indian Child Welfare Act (WICWA), chapter 13.38 RCW, but the BIA had not found any tribal affiliation.

The trial court concluded that ICWA did not apply, and D.S. does not challenge that determination in her appeal.

counsel informed the court that D.S. sought to proceed pro se or, alternately, substitute counsel. D.S. orally requested a continuance based on her counsel's alleged unavailability and "lack of work ethic as a professional," the fact that a relative had expressed interest in adopting A, and D.S.'s upcoming bed date for inpatient treatment. D.S. also expressed concerns about A's behavioral problems and that her foster parents had changed preschools, not receiving paperwork from DCYF, her visitation with A being changed to supervised visits, and that J.M. was conspiring against her. The court questioned D.S. at length regarding her request to represent herself and noted that the issues unrelated to counsel and the continuance would be considered and evaluated during trial.

DCYF opposed "the mother's request for a continuance and appointment of new counsel" and argued that the evidence would show that D.S. was unable to "work with any professional in this case, whether it be the social worker, the visit supervisors, and apparently her attorney" and called D.S.'s request a "delay tactic." The court appointed special advocate (CASA) also opposed D.S.'s request, noting that D.S's various concerns about adoption placement and events leading up to the current proceeding, which were not related to the her request to represent herself and for a continuance so that she could attend treatment, were "issues for trial" and a continuance would delay the trial and permanent placement for A. The trial court found that there was not a basis to grant a continuance or appoint a new attorney. The court then further questioned D.S. regarding her request to proceed pro se, and ultimately, D.S. was permitted to represent herself. Attorney Grainne

Griffiths was retained as standby counsel. DCYF called D.S. as its first witness and questioned her regarding the allegations of parental unfitness in its petition.

When the proceeding resumed on February 28, D.S. joined via Zoom[3] and informed the court that she was in transit to the court. Trial was recessed to allow her time to arrive, which took longer than expected based on D.S.'s representations to the court.[4] DCYF called the following witnesses on February 28 in support of the allegations in its petition: visitation supervisor Hannah Olson, scientific director of a urinalysis provider Dr. Aaron Brown, and an infant mental health therapist and program supervisor. D.S. left the courtroom during Olson's testimony without giving the court her reasons for doing so. Later, D.S. returned and had the following exchange with the judge:

> THE COURT: Actually, I see that [D.S.] is back. [D.S.], I think what we're going to do is take the afternoon recess and start with Dr. Brown at 2:30, because I wasn't sure when you were going to get back, and also Ms. Griffiths printing [sic] some exhibits for you.
>
> [D.S.]: All right.
>
> THE COURT: I am starting with Dr. Brown at 2:30 whether you're here or not.
>
> [D.S.]: I was out there. I didn't know you guys had started. I was waiting for somebody else to come in. I didn't know if it was unlocked or not. I was here. I just didn't know if it was unlocked. I didn't know anybody else was in here, and I seen him come in so I followed behind him.

---

[3] Zoom is a software application commonly used for videoconferencing. Several witnesses and D.S. appeared via Zoom at various points throughout the proceeding.

[4] The trial judge would later state that "over two hours" had been lost on February 28. That day, court was first convened at 9:44 a.m., and D.S. was still in transit. When court was reconvened at 11:12 a.m., D.S. was still in transit. The record is silent as to the exact time when court reconvened with D.S. present.

THE COURT: Okay. Well, you left the courtroom without speaking with me. I have lost—I lost almost all morning this morning—

[D.S.]: I'm sorry.

THE COURT: —we have a limited amount of time for this trial. I want to communicate really clearly that if you need a break, I need you to tell me that. I need you to give me a time you're going to be back, so I'm not just sitting here.

[D.S.] I'm sorry. I just—I was upset, and I needed to get out of here just to get some air for a second, just so I can calm down.

THE COURT: All right. I just need you to let me know that: "I need to leave. I will be back in five minutes," and I will say, "That's all right, I'm going to start again at 2:25."

[D.S.]: Yes, ma'am.

When trial resumed on March 4, D.S. was once again not present at the court and joined via Zoom while still in transit. The judge admonished her and set certain boundaries and expectations related to D.S.'s attendance and participation in the proceeding going forward:

I'm going to start Officer Sheets' testimony at 9:45. If you have not arrived yet, you're going to have to turn on your Zoom, and you'll need to listen by Zoom. This is the last time I give you any leeway, in terms of not being here on time.

DCYF then presented testimony from the following additional witnesses: Montlake Police Department Detective Thomas Sheets, a substance use disorder professional, and a social worker.

D.S. was present on Zoom when court resumed again on March 5. DCYF also called child mental health therapist and clinical social worker Dr. Ursula Hildebrandt, one of A's foster parents, a manager of low-income housing, and infant mental health occupational therapist Laura Jendusa. During Hildebrandt's

testimony, it came to the court's attention that D.S. had disconnected from the Zoom access to the proceeding and testimony was briefly paused to allow her to rejoin. The court summarized Hildebrandt's testimony for D.S.'s benefit when she rejoined the proceeding. D.S. then began to interject while DCYF was examining Hildebrandt, and the trial judge reprimanded her several times, including warning her, "If you use profanity again, if you interrupt again, I'm going to put you in the waiting room, and you won't be able to participate." D.S. then left the Zoom call of her own accord. During Jendusa's testimony, D.S. again rejoined the proceeding via Zoom. The court again summarized the missed testimony for D.S.'s benefit, and D.S. then cross-examined the witness. However, D.S. disconnected from Zoom call again shortly thereafter and did not reconnect. That same day, the CASA testified during D.S.'s absence.

D.S. failed to appear for trial on March 18 after a planned recess. Griffiths informed the court that D.S. was "presently awaiting transport to inpatient treatment" for her substance abuse disorder because a bed had become available. D.S. had filed various items, including what she presented as a motion to continue the termination trial,[5] a motion for her request to be heard on shortened time, a declaration, and what the court interpreted as exhibits D.S. had planned to introduce at trial. D.S. had filed some of the pleadings and materials the previous week and provided others to opposing parties via Griffiths. D.S.'s declaration provided details of her timeline regarding treatment. She stated that on "March 7, 2024, I learned that I finally got an inpatient bed at Kitsap Recovery Center. I am

---

[5] While it was captioned as a "Motion to Continue Termination Fact-Finding," this was substantively and technically a motion for a recess.

set to begin detox on Monday, March 19 and inpatient on Thursday, March 21, 2024."

The court first heard arguments on the motion for shortened time, which was not opposed and was ultimately granted. The court then took up the motion to recess. Griffiths argued on D.S.'s behalf and explained,

> . . . it's really important to [D.S.] that she have the opportunity to get this treatment in a timely manner, and also present her defense at this trial and participate as her own counsel. While [DCYF] continues its case throughout this trial, [D.S.] has indicated to the [c]ourt that she has a lot that she would like to share with Your Honor, to present her evidence, and I believe Your Honor has told [D.S.] that she will have her opportunity to present her defense.
>
> She does have a defense. She has been working very hard to pull that together Your Honor. And she is not choosing to waive that defense. She's very clear that she would like to participate in this trial. She is counsel. She has the right to participate in this trial. If trial goes ahead without her, that is a clear erroneous deprivation of her right to due process to a fair trial.
>
> And she's doing what the [c]ourt has ordered her to do is to get services. She's doing that. So, she should not be deprived of her constitutional rights for following an order of this [c]ourt.
>
> I think, additionally, in terms of judicial efficiency, [D.S.] will benefit from some additional time to think through how she would like to present her case: A, to focus on treatment; B, to get out of treatment; C, to prepare for trial, prepare to present her case.

DCYF countered and emphasized the unfairness of delay to A, D.S.'s previous unsuccessful attempts with treatment, and the suitability of A's current foster parents as adoptive parents.[6] Specifically, DCYF argued as follows:

> Your Honor, [DCYF] strenuously opposes any extension of time or staying of this of this [sic] case for mother to prepare more, or to consider the open adoption agreement, which she has had at least since September of 2023. That is improper, and that is placing the legal rights of the mother over and above the child's right to health, safety and welfare, which under RCW 13.34.020 includes the right

---

[6] Jessica Barnes, social service specialist with DCYF who had worked with D.S., affirmed that the statements of DCYF's counsel were true and correct.

to a speedy resolution of any proceeding under [c]hapter RCW []13.34.

The CASA simply stated that she did "not support the recess of the trial to look into a relative placement." But the CASA agreed to a shorter recess, maintained her position regarding the termination overall, and noted the importance of D.S. completing treatment as to another ongoing dependency involving D.S.'s other young daughter, B.

The court explained the factors it had considered before entering its ruling: D.S. had previously "skipped, or effectively absented herself for much of this trial," and there had been prior opportunities to receive treatment that D.S. had failed to pursue. It also noted that while D.S. had a "right to be heard" and "a fundamental right . . . to parent," DCYF had "an interest in timeliness, an interest in protecting [A]." The trial court also weighed A's interests "in being free from unreasonable risks of harm, and some degree of timeliness and permanency as well as having an interest in the integrity of family relationships." Adding that A "also ha[d] an interest in not being returned or placed" in a "complex and abusive environment." Ultimately, after considering these factors, the court denied the motion for a recess in part and granted it in part. The trial would proceed, but there would be a limited recess and some allowances made for D.S.

The trial resumed without D.S. DCYF called further witnesses in support of its petition on March 18 and 19, including a clinical and forensic psychologist, a visitation supervisor, substance use disorder treatment providers, a psychiatric nurse practitioner, and DCYF social service specialist Jessica Barnes.

D.S. was again present on April 2, joining via Zoom while in transit. D.S. arrived at the courtroom during a recess. Before resuming the proceeding, the trial judge summarized the delays D.S. had caused during the trial up to that point:

> We have lost over a day of time due to [D.S.'s] late arrivals on various days. We lost 45 minutes on February 27th, over two hours on February 28th, an hour on March 4th. That does not include the additional four hours that were lost, or three and- a-half hours that were lost on Monday the 27th, because the mother decided on the first day of trial to discharge her counsel and represent herself and brought a Motion to Continue. It also does not include the -- that doesn't include -- we lost another hour today. And on March 18th, we lost another one-and-a-half hours to a Motion to Continue related to alleged entry into withdrawal management and inpatient treatment, which did not then happen that day.
> So, I say all of that simply to note that we've probably lost at least a day and a half, or not (sic) two—if not two, of trial time that had been planned and scheduled a long time ago, and for which I have limited availability otherwise, as do other counsel.

D.S. then testified on her own behalf, was subject to cross-examination, and examined several witnesses, although the court did not permit her to recall all of the witnesses that had testified during her absence. The trial court terminated D.S's parental rights and entered its findings of fact, conclusions of law, and final order on April 10.

D.S. timely appealed.

ANALYSIS

I.    Invocation of Right to Self-Representation

D.S. avers that the trial court erred when it granted her request to represent herself because her "invocation of the right to self-representation was untimely and

- 9 -

equivocal. And any waiver of right to counsel was not knowing and intelligent."[7] We disagree.

"We review a trial court's decision to grant or deny a motion to proceed pro se for abuse of discretion." *In re Dependency of G.C.B.*, 28 Wn. App. 2d 157, 164, 535 P.3d 451 (2023); *State v. Madsen*, 168 Wn.2d 496, 504, 229 P.3d 714 (2010). The trial court has abused "its discretion if its decision is manifestly unreasonable, is reached by applying the wrong legal standard, or rests on facts unsupported by the record." *G.C.B.*, 28 Wn. App. 2d at 164. RCW 13.34.090(2) mandates that "[a]t all stages in which a child is alleged to be dependent, the child's parent . . . has the right to be represented by counsel" unless the parent waives that right. "Waiver must be a knowing and voluntary relinquishment"; most often, it is an explicit oral request. *In re Dependency of V.R.R.*, 134 Wn. App. 573, 582, 141 P.3d 85 (2006); *see also Madsen*, 168 Wn.2d at 504. If the appellant is asserting error, they bear the burden of establishing that their waiver was invalid. *G.C.B.*, 28 Wn. App. 2d at 164. While "'the evidence of waiver required to be on the record is similar' to that in a criminal case," our appellate courts have declined to "mandate any particular framework or colloquy" to assess a parent's waiver. *Id.* at 165-66 (quoting *In re Welfare of G.E.*, 116 Wn. App. 326, 333-34, 65 P.3d 1219 (2003)).

As a preliminary matter, D.S. urges us to review the granting of her motion to represent herself de novo, as a violation of due process, but she does not offer any authority that actually addresses the waiver of the right to counsel within the

---

[7] At oral argument before this court, D.S. adhered to this position from her briefing. Wash. Ct. of Appeals oral arg., *In re Parental Rts. to A.K.-J.S.*, No. 85721-1-I (Sept. 24, 2025), at 1 min., 29 sec., *video recording by* TVW, Washington State's Public Affairs Network, https://www.tvw.org/video/division-1-court-of-appeals-2025091213/.

framework of due process. Accordingly, we reject this proposed approach and review the issue for an abuse of discretion as directed by controlling precedent. *See id.* at 164.

A.    Unequivocal and Timely Request

We assess whether a request for self-representation is equivocal by considering "factors such as whether the request was formal or spontaneous, whether the defendant truly sought to represent [themselves] or was just expressing frustration, and whether the defendant made the request because of a disagreement over trial strategy." *Id.* at 166.  In doing so, we examine "the surrounding facts and circumstances" of the request. *Id.*  A defendant's "'clear and knowing request'" does not become equivocal simply because the defendant may have a motivation beyond a desire to proceed pro se. *Id.* (quoting *State v. Modica*, 136 Wn.2d 434, 442, 149 P.3d 446 (2006), *aff'd*, 164 Wn.2d 83, 186 P.3d 1062 (2008)).

On the first day of trial, Griffiths, counsel for D.S., informed the court that her client wanted to bring a motion to address D.S.'s problems with Griffiths' representation.  Griffiths stated, "D.S. wished to make a motion to represent herself pro se, or wished to have me substituted for additional counsel. So, I'm raising that request with Your Honor and would defer to [D.S.] for her reasoning."  D.S. detailed her dissatisfaction with her attorney at length and expressed distrust that she asserted had led to the deterioration of their working relationship and her dissatisfaction with the performance of counsel.    D.S. also requested a

continuance to allow time for her to prepare or find new counsel. The court took great care to clarify D.S.'s request as demonstrated by the following exchange:

> THE COURT: . . . I need to have a more specific understanding of, as I understand it, you are seeking to discharge Ms. Griffiths, is that right? As your attorney?
>
> [D.S.]: Yes, ma'am. I'd be better off just to represent myself, at this point.
>
> THE COURT: And is that what you are requesting to do?
>
> [D.S.]: If I can't get another attorney, absolutely. Because every attorney I've had has been the same thing over and over again.

The court heard argument from both DCYF and the CASA on the issue before concluding that there was no basis to continue the trial or appoint new counsel and noted that D.S. had also clashed with her previous attorneys. The trial judge then stated, "I am going to step off the bench and give you a few minutes to consider whether you want to go ahead and represent yourself, or—whether you're continuing to request that you represent yourself in this matter." Before taking a recess for that purpose, the trial judge questioned D.S. further to confirm that she understood the risks and consequences of her request.

After the recess, the trial judge asked if D.S. still wished to proceed pro se. D.S. answered, "I think I still want to represent myself." In response, the trial judge gave a further explanation of the proceeding and the risks D.S. would face in choosing self-representation and then asked, "[A]re you making this decision to represent yourself freely and voluntarily, without someone forcing you to make this decision? Is this this your choice?" D.S. responded, "Yes, it's my choice."

In her briefing on appeal and at oral argument, D.S. maintains that this request was equivocal because it was made alongside requests for new counsel and stemmed from frustration with counsel.[8] She also contends that statements during trial indicated "she was representing herself only because she could not get another attorney" and because she sought assistance of standby counsel, "she did not truly want to represent herself".

These arguments are unavailing for several reasons. First, even if D.S. also requested a different attorney during the initial discussion of self-representation, she also plainly admitted that she had experienced "the same thing over and over again" with other attorneys who had represented her in the past. She also repeated several times that she desired self-representation, including after the court had made clear to her that it was not going to grant a continuance for her to find a new attorney or prepare herself for trial. Our Supreme Court has held that "an unequivocal request to proceed pro se is valid even if combined with an alternative request for new counsel." *Madsen*, 168 Wn.2d at 507. Second, a desire for self-representation due to frustrations with counsel is not a basis for a conclusion of equivocation here. D.S. expressed numerous perceived grievances and stated that she had lost all trust in counsel's ability. She described a situation that went beyond a straightforward disagreement over trial tactics but, rather, was a complete breakdown of their working relationship. *See State v. Stenson*, 132

---

[8] At oral argument before this court, counsel relied on the following to assert that D.S.'s request was equivocal: the desire for new counsel was the "impetus" of the request, it was "born from frustration with assigned counsel, she spontaneously made this request on the day of trial," and she asked whether new counsel would be allowed to represent her if she managed to find someone. Wash. Ct. of Appeals oral arg., *supra,* at 2 min., 40 sec.

Wn.2d 668, 734, 940 P.2d 1239 (1997); *In re Welfare of B.D.*, No. 46504-3-II, slip op. at 9 (Wash. Ct. App. July 28, 2015) (unpublished), https://www.courts.wa.gov/opinions/pdf/D2%2046504-3-II%20%20Unpublished%20Opinion.pdf.[9] Third, we do not consider statements D.S. made later during trial because the judge could not have considered them at the time of the ruling that is challenged in this assignment of error. *See Madsen*, 168 Wn.2d at 507. Finally, asking for help from stand-by counsel throughout trial is not evidence of equivocation; the very purpose of standby counsel is to assist the pro se litigant if necessary. *See State v. Silva*, 107 Wn. App. 605, 626-28, 27 P.3d 663 (2001). Despite the framing of this issue on appeal, the record establishes that D.S. simply made proper use of an available resource. We conclude that the trial judge was within their discretion when they found D.S.'s request was unequivocal.

D.S. also contends in briefing that the trial court erred when it concluded that her request was timely because it was made at the start of the first day of trial and "because the trial court ruled out a continuance and insisted on starting trial, it was manifestly unreasonable to permit [D.S.]" to proceed pro se. However, D.S. misrepresents the purpose of the timeliness analysis and does not present authority demonstrating that a trial court has made a reversable error when it grants a request made at the beginning of trial. Consideration of the timeliness of an invocation of the right to self-representation is not solely to assess the reasonableness of the request but, rather, to determine the status of the right and

---

[9] This unpublished opinion is cited pursuant to GR 14.1 for the sole purpose of illustrating an opinion of this court that also relied on *Stenson* to resolve a similar challenge premised on comparable facts.

to help the trial court balance the right against the court's interest in the smooth administration of justice. *State v. Barker*, 75 Wn. App. 236, 241, 881 P.2d 1051 (1994). We explained in *Barker* that if the request is made well before the start of trial and presented without a request for a continuance, under *Faretta v. California*,[10] the right to self-representation "exists as a matter of law," but the court's discretion on this issue increases the closer the request is to the start of the proceeding and reaches its broadest expanse when the request occurs after the proceeding has begun. *Id.* Our Supreme Court has affirmed that even if the request is made "'as the trial or hearing is about to commence, or shortly before, the existence of the right depends on the facts of the particular case,'" and the trial court may still exercise its own discretion. *Madsen*, 168 Wn.2d at 508 (quoting *Barker*, 75 Wn. App. at 241). The judge did not abuse her discretion in determining that D.S.'s request was timely.

### B.     Knowing and Intelligent Waiver

D.S. avers that because the record does not show that she "understood [DCYF's] allegations and the consequences of an order terminating her parental rights, [her] decision to proceed without counsel was not knowingly and intelligently made." D.S. specifically argues that the trial judge failed to read or summarize the relevant statutes, "explain what the termination of parental rights encompassed," and connect the statutory elements DCYF was required to prove "to the specific allegations made by [DCYF]."[11]

---

[10] 422 U.S. 806 (1975).

[11] D.S. does not offer authority to support that such a duty exists. D.S. relies on *City of Bellevue v. Acrey*, 103 Wn.2d 203, 691 P.2d 957 (1984) in her argument on this issue. However,

Again, a waiver of the right to counsel must be voluntary. *V.R.R.*, 134 Wn. App. at 582. The trial court must ensure that the defendant is fully informed of the "dangers and disadvantages" of proceeding pro se if their waiver is to be deemed "knowing and intelligent." *G.C.B.*, 28 Wn. App. 2d at 168. The preferred method for ensuring the party is informed "is a colloquy on the record." *Id*. at 168-69. At a minimum, this demonstrates "a general understanding of the consequences." *Madsen*, 168 Wn.2d at 505.

Here, the record establishes that the trial court took care to explain to D.S. the issues and complexities that would arise from self-representation and took the necessary time to ensure she understood what she was being told, such that any waiver she made would be knowing and intelligent. The court engaged in the following colloquy on the record:

> THE COURT: . . . So, do you understand that if you represent yourself, you will be held to the same standard as an attorney, in terms of following the Rules of Evidence and following the Court Rules regarding examining witnesses?
>
> [D.S.]: Yes, ma'am.
>
> THE COURT: Do you have—can you tell me a little bit about your level of education, and whether you have any experience representing yourself or with the law?
>
> [D.S.]: Yes. So, I'm a high school graduate. I have some college—sorry I have some college education. As well as vocational by law, [sic] no, not necessarily; but, I did—I've read a lot of it, and it's not that hard. I understand the words are different, but I think if I studied pretty hard, I could get it. That's why I just need a week or two just to get the hang of something—what's going on. That's basically why I'm asking, just because I need to get familiar with this

this case does not specify such a duty, but instead merely holds that a colloquy need only inform "the defendant of the nature and classification of the charge, the maximum penalty upon conviction and that technical rules exist which will bind the defendant in the presentation of [their] case." *Id.* at 211. It does not impose the specific duty D.S. suggests.

case and the terminology, at least the basics of it. You know what I mean?

I have gone to court before, and I've spoken my own behalf, and I feel like I know my own case probably better than anybody else does, except for maybe Jessica [Barnes], and maybe she only knows some of it, you know what I'm saying? So, I mean, I feel like I'm probably the best person to defend myself at this point.

THE COURT: Do you understand that whether or not you are represented as [sic] by an attorney, you're going to have an opportunity to be a witness and to testify in your case on your own behalf and tell me what you want me to know?

[D.S.]: Yes.

THE COURT: Okay. And do you understand that if you do not have an attorney, you will need to either simply testify without having an attorney to ask you questions, or ask yourself questions and answer them?

[D.S.]: I mean, how would I—I don't know how I would ask myself questions and answer them.

THE COURT: Likely you would simply just decide to testify, and I would give you some leeway, and we wouldn't do it in a question and answer format. But do you understand that you'll need to—I have to apply the rules of evidence whether you represent yourself or not?

[D.S.]: Okay.

THE COURT: Do you understand that you have a right—I understand that you are asking that it not be Ms. Griffiths, but you have a right to be represented by counsel at no cost to you in this case because of the nature of the rights that are at stake regarding your parental rights?

[D.S.]: Yes.

THE COURT: All right. And do you understand that if I allow you to—well, if I grant your request to represent yourself, we are going to go forward today to trial. I am not continuing your trial.

[D.S.]: Okay.

THE COURT: All right. Do you want—do you want some time to take a break and consider whether you want to go forward and represent yourself, and are still asking to do that?

[D.S.]: Yes.

After the break, the court continued the colloquy. The trial judge asked if D.S. had participated in a termination proceeding before and if she understood "that the result of this trial, if the State meets its burden and proves its case, is that your parental rights to [A] would be terminated?" D.S. answered, "Yes, ma'am, I do." The court provided a thorough explanation of the burden DCYF had to meet for the parent-child relationship to be terminated, and D.S. answered "yes" when the court asked if she understood all that it had explained to her about the elements and evidentiary standard. The court again asked, "[A]re you making this decision to represent yourself freely and voluntarily, without someone forcing you to make this decision? Is this your choice?" D.S. answered, "Yes, it's my choice." The court ensured that she had access to discovery and reiterated that if D.S. found a new attorney, they could appear on her behalf. The court concluded that D.S. could represent herself and that Griffiths would serve as stand-by counsel. Later, the court reviewed these matters again before providing D.S. an advisement and waiver form that she signed and filed.

Given the extensive successive discussions on the record and the completion of the waiver form, we conclude that D.S.'s waiver of her right to counsel was knowing and voluntary. Because the trial court was within its discretion to accept D.S.'s waiver of her right to counsel as knowing and voluntary, and as previously discussed in section I.A, *supra*, her request was unequivocal

and timely, the trial court did not err when it honored D.S.'s invocation of her right to self-representation and allowed her to proceed pro se.

II.      Voluntary Absence from Trial

D.S. avers there was no "voluntary waiver of either [her] right to present [sic] or representation.  And balancing the interests at stake and the risk of error in proceeding without [D.S.'s] presence or any representation, [she] was deprived of due process."  DCYF also frames D.S.'s absence from portions of the fact-finding trial as a due process issue.  However, both parties are incorrect on this point.  D.S.'s repeated absences from trial were the result of her own agency to voluntarily absent herself and not the result of State action or compulsion.  This fundamentally changes the analysis of her challenge.

D.S. asserts that her situation is analogous to that of the father in *In re Welfare of M.B.*, 195 Wn.2d 859, 467 P.3d 969 (2020).  However, at oral argument before this court DCYF distinguished *M.B.*[12]  In *M.B.,* the father was confined at the time of the termination hearing.  *Id.* at 864.  His attorney had arranged for him to participate telephonically, but "staff at the correctional center declined to cooperate."  *Id.* at 865.  The attorney then sought and received an order directing the Department of Corrections (DOC) to transport the father to the trial.  *Id.*  DOC failed to do so.  *Id.*  "The court issued a new transport order, but because of the busy schedules of the witnesses who were present, the court suggested trial begin in the meantime to take their testimony."  *Id.*  The father never had the opportunity to appear in person and was forced to testify remotely.  *Id.* at 866.  Further, "the

---

[12] Wash. Ct. of Appeals oral arg., *supra,* at 17 min., 35 sec.

record [did] not suggest that [the father] was given the opportunity to consult with his attorney about the proceedings, and when proceedings reconvened in the afternoon for closing arguments, [the father] was not on the phone." *Id.* Our state Supreme Court concluded that reversal was required

> because [the father] did not receive due process of law before his parental rights were terminated. The State's interest in avoiding a relatively minimal delay did not outweigh [the father's] fundamental interest in maintaining his legal relationship with his child and the risk of error arose because [the father] was not afforded an opportunity to evaluate the State's evidence and consult with his attorney before presenting his defense.

*Id.* at 878.

D.S.'s situation is nothing like the circumstances that warranted reversal in *M.B.* because, even before her bed date, she repeatedly and voluntarily absented herself from trial and those absences were not compelled by any government actor. Before the court had implemented its plan to manage the proceedings now challenged on appeal, D.S.'s own actions had established a pattern that undermined her right to be heard and to representation.

This makes her case much more like *State v. Davis*, 195 Wn.2d 571, 461 P.3d 1204 (2020). There, Davis chose to leave the courtroom, unlike the father in *M.B.* whose absence was the result of DOC refusing to arrange for his presence at, or remote access to, the proceeding. Davis exercised his right to self-representation in his criminal case and repeatedly disrupted trial by screaming, yelling, and taking an excessive amount of bathroom breaks. *Id.* at 574-77. Our Supreme Court held that "Davis voluntarily and knowingly left the courtroom, waiving his right to be present." *Id.* at 583. At oral argument before this court, D.S.

attempted to distinguish her case, arguing that Davis wanted to leave the courtroom and had "no legitimate reason to not be at trial . . . in this case, [D.S.] is court ordered, not only in A's case, but in B's case, to attend chemical dependency treatment."[13]  But, as described, D.S. routinely missed trial *before* her absence to purportedly attend inpatient treatment, and she often arrived late or left either the courtroom or Zoom access to the proceeding of her own accord.  None of those absences were the result of a court order, but D.S.'s own voluntary courses of action; conduct which our Supreme Court held in *Davis* amounts to a waiver of the right to presence.  *Id.*  Further, when D.S. missed trial for in-patient treatment, she failed to report to the facility the first day and instead attended to other matters.

A "parent's right to be heard is not self-executing and [they] must take reasonable and timely steps to exercise that right." *In re Welfare of L.R.*, 180 Wn. App. 717, 724, 324 P.3d 737 (2014).  D.S. failed to take reasonable steps to exercise her right to be heard throughout trial.  As outlined herein, she was routinely late to court, left the courtroom or Zoom connection to the proceeding unannounced, and was disruptive when she was present.  The trial judge observed that because of D.S.'s absences and tardiness, they had "probably lost at least a day and a half . . . if not two, of trial time that had been planned and scheduled a long time ago, and for which I have limited availability otherwise, as do other counsel."  D.S.'s decision to represent herself does not factor into our analysis of this assignment of error; the absence of counsel for portions of the proceeding was a direct result of her own choices to invoke her right to self-representation and then

---

[13] Wash. Ct. of Appeals oral arg., *supra,* at 7 min, 27 sec.

- 21 -

fail to appear. If D.S. planned to be absent, to attend in-patient treatment for example, and was concerned about the trial continuing without her presence, she reasonably could have requested that the court reappoint her standby counsel to resume direct representation.

D.S. also contends that because she was attending treatment due to a court order, her absence was involuntary. Again, we disagree. While D.S. had informed the court in her trial brief of the *possibility* of an upcoming bed date, she never provided the court with a specific date until after she had already chosen to be absent. Additionally, as the trial court observed, D.S. had failed to follow through with previous attempts at treatment, and D.S. does not provide authority that the trial court was required to recess to allow her to make another attempt. Critically, when DCYF asked Barnes for an update regarding D.S.'s arrival at in-patient treatment, Barnes relayed D.S had instead gone to a Department of Health and Human Services office because someone had purportedly stolen her benefits card. So, while she contends that her absence was due to court-ordered attendance at substance use treatment, the record establishes, for at least part of the time she was absent from the court proceedings, that she was attending to matters unrelated to treatment of any kind. We do not afford someone who has chosen to represent themselves any "special consideration and the inadequacy of the defense cannot provide a basis for a new trial or an appeal." *State v. DeWeese*, 117 Wn.2d 369, 379, 816 P.2d 1 (1991). The "consequences, which often work to the defendant's detriment, must nevertheless be borne by the defendant." *Id.* We

will not permit D.S. to manufacture an alleged error through her own actions and then attempt to seek relief from her own behavior on appeal.

III.     Findings Regarding A's Sibling Relationships

Finally, D.S. avers that the trial court erred because it "failed to consider the impact termination would have on A's relationship with her sisters and brothers," outside of A's relationship with her sister, B.   D.S. asserts the trial court was required to enter these findings under RCW 13.34.190(1)(b), which mandates a finding from the trial court that the order to terminate the parent-child relationship is in the child's best interest, and RCW 13.34.200(3), which demands that the trial court address the status of the child's sibling relationships.  She is incorrect.  D.S.'s argument on this point seeks to conflate these two separate statutory requirements which, although related, reflect different requirements.  More critically here, the trial court's findings were sufficient.

As a prerequisite for termination RCW 13.34.190(1)(b) requires a finding that it "is in the best interest of the child."  RCW 13.34.200(3) mandates that the trial court "include a statement addressing the status of the child's sibling relationships and the nature and extent of sibling placement, contact, or visits."

The trial court entered the following findings regarding A's relationships with her siblings:

> 2.17    [B] resides in a different foster home from [A], but the foster parents arrange for the girls to see each other frequently. Both parents agree that it is important for the sisters to spend time together.  The girls have also seen each other at visits with their mother.
>
> . . . .

- 23 -

2.47    Besides [A] and [B], [D.S.] has four older children who have mostly lived in Ohio: [C], age 19; [M], age 16; [L], age 15; and [H], age 5. [Child Protective Services] in Ohio was involved with [D.S.] and her children. [D.S.'s] parental rights to [L] were terminated. Her four older children have resided primarily in the care of other family members.

2.48    [C] came to live with [D.S.] in Washington when he was 17 years old. [C] has been involved in drug use. [D.S.] changed the locks on her apartment multiple times and refused to let [C] in, even when his name was on the lease. [C] slept in the hallway outside [D.S.'s] apartment and knocked on other tenants' doors, asking for food.

This court has previously rejected arguments that have attempted to assert that RCW 13.34.190(1)(b) and RCW 13.34.200(3), when read together, require consideration of sibling relationships under the best interest of the child standard. *See In re Dependency of J.D.P.*, 17 Wn. App. 2d 744, 755-61, 487 P.3d 960 (2021). D.S. avers that our state Supreme Court disapproved of the *J.D.P.* holding and analysis in *In re Dependency of M.L.W.*, 4 Wn.3d 53, 69-70, 558 P.3d 919 (2024) (*M.L.W.* II). However, a careful reading of *M.L.W.* II rebuts this assertion.

Crucially, both *J.D.P.* and *M.L.W.* II involved attempts by at least one older sibling who was not the subject of the dependency proceeding to *intervene* and considered the rights of those siblings in that context. None of A's siblings attempted to intervene in the proceedings in such a manner, and the expression of disapproval regarding *J.D.P.* was limited to a statement of the law regarding the unique context of sibling intervention. *M.L.W.* II, 4 Wn.3d at 69. The Supreme Court decided *M.L.W.* II "solely on [the intervenor's] lack of standing" and left undisturbed "any decisions of this court or the appellate courts holding that the due process clause protects the right to family integrity," including those "recognizing

sibling relationships are encompassed within that right to family integrity." *Id.* Specifically, the Supreme Court disagreed "with a portion of the Court of Appeals analysis." *Id.* They noted the Court of Appeals had cited *J.D.P.* to hold that children "'have no legal interest [in sibling relationships] beyond what is found in dependency statutes for limited contact facilitation by the Department.'" *Id.* (alteration in original) (quoting *In re Dependency of M.L.W.*, 28 Wn. App. 2d 252, 266, 535 P.3d 491 (2023) (*M.L.W.* I), *aff'd, M.L.W.* II, 4 Wn.3d 53).[14] The Supreme Court clarified that this was a misstatement of the law and emphasized that "the constitutional right to family integrity protects a child's interest in sibling relationships." *Id.* at 69-70. Thus, the Supreme Court's disagreement with the Court of Appeals' analysis and holding went only to the rights of the intervenors, not the portion of *J.D.P.* that addressed the interplay between the statutes.

Here, the trial court properly considered all the evidence and entered findings that addressed A's sibling relationships as required by RCW 13.34.200. It entered finding 2.17 regarding A's relationship with B, her younger sister, expressly included an acknowledgment of the importance of that relationship, and described the steps that their respective foster parents were undertaking in order to maintain a connection between the two girls. Finding 2.17 specifically noted that both sets of foster parents "agree that it is important for the girls to see each other" and "arrange for the girls to see each other frequently" which, even if not required, indicated that A's interest in maintaining that relationship was being honored. In finding 2.47, the court additionally found that D.S.'s middle children all still

---

[14] The alteration of "in sibling relationships" comes from our Supreme Court's quotation of *M.L.W.* I in *M.L.W.* II. 4 Wn.3d at 69.

remained in Ohio living with relatives, and D.S.'s parent-child relationship with one of those children had already been terminated. While finding 2.47 is silent on A's contact with these siblings, it plainly establishes the court's awareness of the existence of, and possible obstacles to, all of A's sibling relationships. Finally, as to A's older brother, C, Jones testified to past contact between C and A. However, as noted in finding 2.48, C had a history of drug use, D.S. also testified that C had used cannabis while living with her and, critically, D.S. stated she was not aware of his whereabouts during the trial. D.S. fails to provide compelling argument as to why the findings set out herein that plainly address the scope of A's relationships with her siblings establish anything other than the court's awareness and consideration of those sibling relationships, or how they undermine its finding that termination of D.S.'s parental rights was in A's best interest. The trial court entered the findings required by statute.

Affirmed.

WE CONCUR: